No. 51,418

State of Kansas, *Petitioner*, v. Wilbur S. Stakes, *Respondent*.

(608 P.2d 997)

Opinion filed April 5, 1980. ▮

*Roger N. Walter,* disciplinary counsel, of Topeka, argued the cause and was on the brief for the petitioner.

*Edwin P. Carpenter,* of Hiatt, Crockett, Hiatt & Carpenter, Chartered, of Topeka, argued the cause, and *E. Roger Horsky,* of Leavenworth, was with him on the brief for the respondent.

*Per Curiam:* On August 9, 1979, a panel of the Kansas Board for Discipline of Attorneys held a hearing on a complaint against respondent Wilbur S. Stakes, Jr., a member of the bar of this state practicing in Leavenworth County. The panel filed its report, findings and recommendation on September 4, 1979. The action is before this court pursuant to Supreme Court Rule 212 (225 Kan. lxxxvi-lxxxvii).

The formal complaint encompassed two separate complaints filed with the Board. The first matter involved alleged conflict of interest arising from certain dealings between American Roofing & Heating Co., Inc., and the City of Lansing, Kansas. Respondent had been closely involved with the corporation as an attorney, officer, and named stockholder prior to being appointed as the Lansing city attorney. While respondent was serving as city attorney the corporation had certain dealings with the city. Further recitation of the involved factual situation relative to this aspect of the complaint is unnecessary, inasmuch as the panel dismissed this portion of the complaint on the ground of insufficiency of the evidence.

This brings us to the section of the complaint involving the respondent's charging of an allegedly excessive fee (DR 2-106, 225 Kan. xcix) to the City of Lansing. A rather unusual procedure was utilized by the panel in the hearing herein. This procedure resulted from the circumstance that both counsel had entered into written stipulations of fact with documentary attachments thereto. At the hearing neither counsel presented any additional evidence. The panel accepted the stipulations as the disciplinary administrator's presentation of evidence. Respondent's counsel, however, did make the respondent available to the panel to

answer any questions that members of the panel had relative to the stipulations. This arrangement was apparently in accord with the agreements made by counsel at the time the written stipulations of fact were entered into. As a result of this procedure, the transcript of the hearing consists wholly of questions propounded by the panel members and respondent's answers thereto.

The stipulation of facts, shorn of statements relative to the American Roofing complaint, is as follows:

"1.  Wilbur S. Stakes, Jr., is an attorney at law, registered to practice in the State of Kansas, with his last registration address at Holiday Plaza, Lansing, Kansas, 66043.

"2.  During the years 1975, 1976 and 1977, and at all times material herein, Respondent was retained by the City of Lansing, Kansas, a municipal corporation, as City Attorney.

.  .  .  .

"11.  On or about June 1, 1976, John W. Jamison, through his parents, John W. Jamison and Mable Jamison, petitioned the City of Lansing to re-zone certain property situated in the City of Lansing, for the purposes of establishing Fawn Valley Subdivision. Likewise, on or about the 6th day of June, 1976, John W. Jamison, through his parents, John W. Jamison and Mable Jamison, petitioned the City of Lansing to establish a benefit district for the purposes of constructing streets and sewers to the property subject to the re-zoning.

"12.  The firm of Browne and Wessel, Consulting Engineers, Kansas City, Kansas, was hired by the City of Lansing for the purpose of providing street and sewer plans for the improvements to be made in Fawn Valley Subdivision. Attached hereto and marked as Exhibit 'I' are letters dated July 20, 1976, from Robert C. Wessel establishing the engineer's estimates on the construction of the sanitary sewers and streets in Fawn Valley Subdivision.

"13.  The Respondent, Wilbur S. Stakes, Jr., received from the One Hundred and Fifty Thousand Dollars ($150,000) proceeds the temporary notes for the sanitary sewers and streets for Fawn Valley Subdivision certain sums paid by check from the City of Lansing, Kansas, which sums are attached hereto and marked as Exhibit 'J' to this petition. It is stipulated the Respondent drew fees in the total amount of Eighty-one Thousand Dollars ($81,000.00) out of the original temporary notes.

"14.  That if John W. Jamison were called to testify in this matter he would testify consistent with his Affidavit of August 15, 1978, which Affidavit is attached hereto and marked as Exhibit 'K' to this stipulation.

"15.  That if Charles B. Hall, President of the City Council, the City of Lansing, Kansas, were called to testify, he would testify consistent with his Affidavit of August 9, 1978, which Affidavit is marked and attached hereto as Exhibit 'L' to this stipulation.

"16.  That W. Edward Nichols is an attorney registered to practice in the State of Kansas. That he is recognized in the State of Kansas as a bond attorney, and the substantial portion of his practice is in the area of government bonds. The parties

stipulate and agree he is an expert concerning government bonds, and the proper fees to be permitted and allowed in relationship to the legal work involved with the preparation and issuance of municipal bonds. That if Edward W. Nichols were called to testify in this matter, he would testify consistent with his Affidavit of the 24 day of July, 1979, attached hereto and marked as Exhibit 'M' to this stipulation."

The affidavit of John W. Jamison, referred to in paragraph 14 of the stipulation, is as follows:

"JOHN W. JAMISON, of lawful age and being first duly sworn, deposes and states the following, to-wit:

"1.   That Affiant is a resident of the City of Eudora, Kansas.

"2.   That Affiant's primary business is that of being a housing developer, having been such for the past twenty (20) years, and intimately aware of and familiar with the housing subdivision in various cities throughout the state of Kansas;

"3.   That on or about the first (1st) day of June, 1976, Affiant, through his parents, John W. Jamison and Mable Jamison, petitioned the City of Lansing, to rezone approximately One Hundred and Six (106) acres of unimproved real property situated in the City of Lansing;

"4.   That on or about the sixth (6th) day of June, 1976, Affiant and his parents, John W. Jamison and Mable Jamison, petitioned the City of Lansing to establish a benefit district for the purpose of constructing streets and sewers as to the property subject to the rezoning petition;

"5.   That on or about the twenty-fourth (24th) day of August, 1976, Affiant entered into an agreement whereby his parents would sell to him the said One Hundred and Six (106) acres;

"6.   That Affiant specifically authorized the payment of all engineering and legal fees prior to the commencement of any improvements as to said property;

"7.   That Affiant suggested that the City Attorney for the City of Lansing, Kansas, namely, Wilbur S. Stakes, Jr., should be permitted to charge a fee of eleven percent (11%) as to the estimated cost of improvements, namely, Eighty-One Thousand Dollars ($81,000) and that said fee could be payable to the City Attorney during the first two years of the project;

"8.   That Affiant has specifically approved the City Attorney withdrawing his fees as indicated above, in 1976 and 1977;

"9.   That Affiant admits receiving a notice of intent to declare a promissory note in default as to the aforementioned Agreement on or about the eleventh (11th) day of December, 1976;

"10.   That Affiant, after being notified of default by the City Attorney of Lansing, Kansas, stated to both the City Attorney and the President of the City Council, namely, Charles B. Hall, that the default had been cured, that the project was to proceed, and that the remainder of the agreed upon fees could be paid out of the benefit district funds;

"11.   That the Affiant, as the developer of the project, realized that these fees would ultimately be borne by him and the land subject to the benefit district and further authorized the fees to be paid to the City Engineer and City Attorney, respectively."

The affidavit of Charles B. Hall, referred to in paragraph 15 of the stipulation, is as follows:

"CHARLES B. HALL, of lawful age and being first duly sworn, deposes and states, to-wit:

"1.   That Affiant is a resident of the City of Lansing, State of Kansas;

"2.   That Affiant was member of the governing body of the City of Lansing, and President of the Council during all times encompassed by this Affidavit;

"3.   That Affiant during all periods of time covered by this Affidavit was chairman of the Finance Committee of the governing body of the City of Lansing;

"4.   That Affiant as a member of the governing body of the City of Lansing, and President thereof, was present at all meetings of the City Council concerning the rezoning of certain property owned by John and Mable Jamison, and the petition to the governing body of the City of Lansing to establish a benefit district for the construction of streets and sewers thereon, which petition was signed by both John and Mable Jamison and John W. Jamison of Eudora, Kansas;

"5.   That Affiant personally contacted, on several occasions, John W. Jamison of Eudora, Kansas, as developer of the project, concerning the allowance and authorization of fees to the then City Attorney, Wilbur S. Stakes, Jr., in the amount of eleven percent (11%) of estimated cost of the project;

"6.   That Affiant spoke with John W. Jamison of Eudora, Kansas, on many occasions in late 1976 and early 1977 as to the allowance of these fees and each occasion, John W. Jamison specifically authorized that these fees should be paid to the City Attorney as well as the City Engineer for work performed on the project in accordance with the agreed upon fees and that these fees were to be paid in advance during the first two years of the project;

"7.   That Affiant, as president of the City Council of Lansing, was aware that these fees had been authorized by John W. Jamison, as developer, as purchaser under an agreement to purchase and sell real property with his parents as to said property;

"8.   That Affiant telephoned John W. Jamison in early January 1977 to inquire of him as to the notice of intent to declare a promissory note in default, and that John W. Jamison assured Affiant that default had been cured, and that the project was to proceed and that the fees as above mentioned, should be paid to the City Attorney and the City Engineer;

"9.   That John W. Jamison repeatedly represented to Affiant that said fees were in fact authorized and approved by Mr. Jamison, that said fees could be paid to the City Attorney and City Engineer and that the fees would ultimately be assumed by the developer as to the project."

The affidavit of W. Edward Nichols, referred to in paragraph 16 of the stipulation, is as follows:

"W. Edward Nichols, of lawful age, and having been duly sworn on his oath, states:

"1.   He is an attorney registered to practice in the State of Kansas, with his office address at Two Townsite Plaza, Topeka, Kansas.

"2.   Affiant is a recognized bond attorney in the State of Kansas and a substantial part of his practice is in the preparation and issuance of government bonds.

"3. Affiant has reviewed the bond transcripts for the public improvement projects of the City of Lansing, Kansas, as they relate to Fawn Valley Subdivision, and Affiant has reviewed the Stipulation of Facts in the case of John C. Tillotson, Complainant, vs. Wilbur S. Stakes, Jr., Respondent, Case No. W1262.

"4. Assuming the facts as shown in the bond transcripts and the stipulation, and assuming that the Respondent prepared the bond transcripts for review by bond counsel, I have an opinion as to whether or not the $81,000.00 received by Wilbur S. Stakes, Jr., was excessive, based upon the considerations of DR 2-106 Fees for Legal Services. A maximum fee for the work done, taking the evidence in its most favorable light to the Respondent, would have been Seventy-five Hundred Dollars ($7500.00). That opinion is that the fees for doing that work are excessive. A maximum fee for the work contemplated to complete the ultimate financing taking the evidence in its most favorable light to the Respondent, would have been Seventy-five Hundred Dollars ($7500.00).

"5. Assuming that the Respondent was responsible in addition to the bonding work, for the legal work necessary to have the Fawn Valley Subdivision property platted, re-zoned, and otherwise developed including the installation of all utilities, the pinning of the lots, and other administrative matters related thereto, I do not have an opinion concerning the excessiveness of the fees."

$75,000 of the temporary note proceeds went into a special account captioned "Fawn Subdivision-Street Improvement City of Lansing, Kansas." From said account respondent received the following:

| | |
|---|---|
| 9-1-76 | $10,000.00 |
| 1-4-77 | 11,000.00 |
| 4-28-77 | 13,000.00 |
| 5-16-77 | 4,500.00 |
| 9-19-77 | 2,000.00 |
| Total | $40,500.00 |

The other $75,000 of the temporary note proceeds went into a special account captioned "Fawn Subdivision-Sewer Improvement City of Lansing, Kansas." From said account respondent received the following:

| | |
|---|---|
| 9-13-76 | $10,000.00 |
| 1-4-77 | 11,000.00 |
| 4-28-77 | 13,000.00 |
| 5-16-77 | 4,500.00 |
| 9-19-77 | 2,000.00 |
| Total | $40,500.00 |

The panel found and concluded as follows:

"This matter was presented again by stipulation of facts which are incorporated herein by reference as though set out in full. In addition thereto, Attorney Stakes

testified and was cross-examined by the Disciplinary Administrator and examined by members of the Panel. Further, by agreement of the parties, the transcripts of the temporary notes issued in July of 1976 under date of July 27, 1976, Attorney General letter, and in August of 1976 under date of August 9, 1976, Attorney General letter, were considered as evidence herein and are included in the record herein.

"The allegations of this complaint are that Wilbur S. Stakes acted unprofessionally in that he violated the provisions of DR 2-106 (A). This allegation is an allegation that an attorney has entered into an agreement for or has charged or has collected an illegal or clearly excessive fee. The standard by which such fee is to be determined to be clearly excessive is set forth in DR 2-106(B) (1) through (8), inclusive. In addition thereto, the Kansas Supreme Court in *Newcomb v. Brettle*, 196 Kan. 560 (1966), has stated as follows:

" 'The test is the fairness and reasonableness of the contract as applied to the client; and the question depends upon the circumstances of each case. The words, "unjust or unconscionable," as applied to these contracts mean nothing more than that the amount of the fee contracted for, standing alone and unexplained, would be sufficient to show that an unfair advantage had been taken of the client, or that a legal fraud had been perpetrated upon him. To be unconscionable, the contract must be such as no man in his senses and not under a delusion would make on the one hand, and no honest and fair man would accept on the other. . . .'

"The stipulation of facts is accepted by the Panel as true and correct and is incorporated herein by reference as though set out in full as a finding of fact herein.

"Several comments are in order concerning the stipulation of facts and the evidence presented by Wilbur S. Stakes, Jr., in this proceeding.

"Essentially, these fees arose out of Wilbur S. Stakes, Jr.'s relationship to the City of Lansing as City Attorney and his relation to the developer, John W. Jamison, Jr., who had petitioned the City for rezoning of a certain 106 acre tract and for the issuance of bonds to provide street and sewer services to a proposed subdivision on the tract, to be known as Fawn Valley Subdivision. Ultimately, two temporary notes, each in the amount of $75,000.00, were issued pursuant to K.S.A. 12-6a01 et seq., and from the proceeds of those temporary notes Wilbur S. Stakes, Jr., received $81,000.00 as and for a professional fee.

"It was Attorney Stakes' contention in this matter that when he accepted employment with the City, he was paid $200.00 per month to attend two City Council meetings a month and to appear in Municipal Court twice a month and to draft ordinances as requested by the City. In addition, he was assigned the job by the City Council of creating a new image for the City of Lansing and of attracting development (industrial, commercial and residential) to the City of Lansing.

"It was Attorney Stakes' contention that in connection with this assignment he expended some 1,600 hours, which amounted to almost 50% of the time that he spent in the professional practice of law over the period in question. Of that 1,600 hours, it was Attorney Stakes' uncontroverted testimony that approximately 800 hours of his time was spent in connection with Fawn Valley Subdivision.

"It was further Attorney Stakes' testimony in this case that at the time that he expended these efforts on behalf of the City to attract new industry and develop-

ment and incurred unreimbursed personal expenses in addition to the expenditure of his time, he had an understanding with the City Council that he would not receive direct payment by the City for his efforts in this regard but rather he would be permitted to act as counsel for the industries or developers he would attract, thus generating fees for professional services and thus, in an indirect sense he would be reimbursed by his efforts on behalf of the City through his device. It is apparently Attorney Stakes' position that, although the fee in question was excessive for the issuance of the temporary notes in question, the fee was equivalent to the time and effort he spent on behalf of the City in attempting to attract industry and development.

"Secondly, it was Attorney Stakes' contention that pursuant to his authority from the City Council to negotiate fees with the developers, he, with the knowledge and consent of the City Council Finance Committee and responsible authorities in the City of Lansing, did agree with Jamison to a fee of 11% of the total estimate project costs of Fawn Valley Subdivision, to be paid to him in the first two years of the project (which was expected to run four to five years). He further testified that it was his understanding with the developer that he would be performing all legal services appropriate and necessary in connection with the various multiphase development of the subdivision, including restrictive covenant preparation, plat plans, working with surveyors, homes association formations, negotiation of contracts on commercial property, and negotiations of street contracts, sewer contracts, etc.

"It was, therefore, Attorney Stakes' contention that the $81,000.00 fee herein was justified on the grounds that (a) it was payment to him by the City for work he had done on other matters (he so testified), (b) Jamison had authorized the City to pay in this fashion (see Jamison's affidavit), and (c) it was a negotiated fee with the developer for work to be done for the developer. The evidence in this case established that the $81,000.00 was paid to him by the City from funds derived from the sale of the temporary notes referred to above. The evidence established that a fee of this magnitude was an unprofessional fee within the meaning of the Code of Professional Responsibility if the fee were paid for services rendered to the City in connection with the issuance of bonds of the City, including temporary financing by the issuance of temporary notes.

"The evidence further established that there was a considerable amount of public interest focused in the City of Lansing in regard to this transaction, and apparently other matters not clearly covered by the evidence. Ultimately, Attorney Stakes, although he attempted to resign, was terminated and fired after his resignation letter as City Attorney had been submitted. Many, if not all, of the City officials were apparently the subject of recall petitions and were removed from their offices by the electorate of the City of Lansing. (The proceedings themselves at the State Disciplinary Board were the subject of some considerable press interest and public interest, showing again some continuation of the public interest in this matter. This Panel does not feel that public interest in and of itself has any relevancy in its determinations, but does think that it is somewhat relevant in regard to the question of whether or not an attorney has brought discredit to himself or to the legal profession of a reasonably notorious nature.)

"The evidence established that Mr. Jamison was unable to proceed with the development and that apparently Attorney Stakes continued to draw some funds

toward the $81,000.00 even at times after there were some indications of the inability of Jamison to continue the project. Ultimately, Jamison's inability was recognized by Attorney Stakes, and he testified that at this point he felt that the fee may have been excessive in that it was intended to cover work done in the future as well as to date in connection with the ultimate multiphased development of Fawn Valley Subdivision.

"The evidence established that when Attorney Stakes realized the extent of Jamison's inability to perform, Stakes undertook various efforts to find successors-in-interest to Jamison who could ultimately perform in such a way as to prevent the City from sustaining a loss and to allow the project to proceed. He has apparently been successful in this regard in that the Jamison property has been sold to a corporation, which is substantially controlled by an uncle of the respondent, and into which, since the first of the year, respondent has himself invested $55,000.00, and in which Stakes now owns an ownership interest. The evidence establishes that the streets and sewers have either been constructed or are in the process of being constructed and that lots are presently being sold in the subdivision. The bond issues were never pursued, and the streets and sewers have been built with private financing; none of the proceeds from the sales of the notes were used to finance the project.

"The evidence established that, prior to the time that Jamison could not finish the work on the project, Attorney Stakes knew that Jamison intended that the outstanding temporary notes would be paid by either (a) increasing the sale price on the various lots, and using the additional money received from the sale to pay the assessment on the lot or (b) selling the lots subject to the special assessment created at the time bonds were issued to take up the temporary notes.

"The evidence established that the temporary notes are due in July of 1980. The Panel was advised that as the lots are being sold, money is being escrowed for repayment of the temporary notes and that it is contemplated that outside financing will repay the City the amount of the temporary notes.

"The evidence in this case does clearly establish that the notes and intended bonds were to be issued as general obligations of the City and were to be paid for by assessments within a benefit district.

"There appears to be considerable confusion in Attorney Stakes' mind between his client, the City; his obligations to the taxpayers of the City of Lansing; and his relationship to the developer, legal services he intended to perform on behalf of the developer, and his present role as investor in the Fawn Valley Subdivision.

*"Conclusions of Law*

"1. The Panel concludes as a matter of law on the facts presented that a fee of $81,000.00 was clearly excessive for legal services rendered to the City of Lansing for and in connection with the issuance of temporary notes and matters in connection with the Fawn Valley Subdivision performed for and on behalf of the City of Lansing. Of course, the facts in this case raise a question as to who the client was and what the fee was paid for, but the facts do in fact clearly establish that the fee was actually paid by the City of Lansing out of the proceeds of temporary notes issued herein, irrespective of what Attorney Stakes may have considered the payments to be for and irrespective of whom he actually felt he was serving in an attorney-client relationship."

The panel then concluded that the respondent's testimony

clearly established an additional violation of the Code of Professional Responsibility "in connection with the acceptance of private employment in a matter where a public official has substantial public duties to perform and in a matter where the appearance of impropriety may exist."

The panel, however, took no action on this additional violation which surfaced in respondent's testimony.

The panel was unable to agree as to a recommendation concerning the discipline to be imposed. The record was then presented to the Kansas Board for Discipline of Attorneys, two members not participating, which adopted the panel's findings of fact and conclusions of law, and recommended that the respondent be punished by indefinite suspension from the practice of law.

The respondent filed the following exceptions to the panel's report:

"2. The record in the instant case is without evidence to establish that the Respondent violated the standards of DCR 2-106.

"3. The record fails to establish by clear and convincing evidence a violation of DCR 2-106, as there exists no expert testimony that the fee for the services rendered and contemplated was excessive.

"4. That the Hearing Panel and Kansas Board for Discipline were influenced by unfavorable press concerning the alleged violation of the Respondent, and the proposed discipline is based upon public pressure extrinsic to the facts and circumstances as shown by the record.

"5. The punishment suggested by the Kansas Board of Discipline is excessive under the circumstances.

"6. The punishment suggested by the Kansas Board of Discipline is in violation of the Equal Protection clause of the United States and Kansas Constitutions, in that others have received lesser or no punishment in similar circumstances."

The court has carefully reviewed the record and concludes that the panel's findings and conclusions, above recited, are amply supported therein. From respondent's testimony we note that the $81,000 disbursements were made to respondent on his own request and were not subjected to the approval of the city council. All checks were signed by the city clerk and city treasurer, plus either the mayor or the president of the city council. We further note that the respondent gave inconsistent explanations as to precisely what services the $81,000 was in payment for. At various places in his testimony he states the $81,000 was a negotiated fee between himself and the initial developer, Ja-

mison, based on 11% of the total project cost ($700,000) for services respondent was to perform primarily in the future for the developer.

At another place in his testimony the respondent states that the $81,000, at least in part, was payment by the city for some 1,600 hours of promotional work performed for the city prior to the payment of the fee. Of the 1,600 hours so charged, respondent attributes 800 hours to the Fawn Valley Subdivision. However, respondent further states that at no time did the city agree to pay him for promotional work. Respondent states the agreement was that, whereas he would not be paid for his promotional work, he would be permitted to accept employment from any developers he was able to attract to Lansing. Presumably, such employment would encompass only the future performance of such work for the developer as might be agreed upon between respondent and the developer. Respondent does not contend that the $81,000 fee was a fair fee for work done solely in connection with the temporary notes. After it became apparent that Jamison would be withdrawing from the project, respondent neither returned any part of the fee to the city, nor offered to do so. When the smoke cleared away, respondent had the $81,000, plus 30% of the project (apparently having paid some $55,000 therefor). Respondent's uncle became the principal owner of the project after the Jamison involvement terminated.

The finding of the panel that "[t]here appears to be considerable confusion in Attorney Stakes' mind between his client, the City; his obligations to the taxpayers of the City of Lansing; and his relationship to the developer, legal services he intended to perform on behalf of the developer, and his present role as investor in the Fawn Valley Subdivision," is, in itself, a considerable understatement.

We do not hesitate to conclude that the $81,000 fee was paid by the City of Lansing from the proceeds of the temporary notes and that said fee was far in excess of a proper fee for services rendered in connection with the issuance of such notes. A violation of DR 2-106 by the respondent has clearly been established.

We turn now to the question of the appropriate discipline to be imposed. In making such determination we must consider the facts of the violation as well as any aggravating or mitigating circumstances. Respondent contends that the Board's recom-

mendation of indefinite suspension from the practice of law is too harsh and would be inconsistent with discipline previously imposed by this court for allegedly comparable violations. In *State v. Alvey,* 215 Kan. 460, 466, 524 P.2d 747 (1974), a similar contention was made and this court stated:

"Respondent also complains that the recommendation of the board of discipline by indefinite suspension was unreasonably harsh. To support this argument he reviews many of our disciplinary cases, reciting the facts and the resulting punishment. He points out that in none of our cases has indefinite suspension been imposed unless there was venality, dishonesty, or moral turpitude involved. He emphasizes that *In re Carson,* 205 Kan. 456, 469 P.2d 349 [1970], is the only disciplinary case before this court which has any similarity with the present case. The respondent, Carson, was charged with neglect of his client's business and was publicly censured.

"As heretofore stated, no punishment is provided in the Code of Professional Responsibility. Rule 207 (*n*) provides that recommendations of the board as to punishment may be (1) private censure, (2) public censure, (3) suspension for a definite or indefinite period, or (4) disbarment; but the nature of the punishment is not limited to these designations. The rule provides no guidelines for categorizing acts of misconduct in any one of the suggested forms of punishment. The only limitation on punishment is the collective conscience of this court. We recognize that a pattern has developed to some extent in our disciplinary cases, and that we should strive for consistency in the exercise of our judicial judgment."

By way of mitigation the respondent directs our attention to the fact this is the first time he has been involved in a disciplinary proceeding and that the City of Lansing will suffer no financial loss as a result of the violation. Respondent also notes that certain members of the city council knew the fees were being paid to him and that the developer, Jamison, was in agreement with the payment of the fees in this manner.

Conspicuously absent from the testimony of respondent, or from his brief, is any admission of violation of DR 2-106, any suggestion that he should have proceeded differently, or that in like circumstances he would proceed in a different manner in the future. The fact respondent was city attorney during the transactions in question must be considered as an aggravating factor. The violation herein can only be regarded as both willful and flagrant. Under the totality of the facts and circumstances herein, the majority concludes that the respondent's misconduct justifies the discipline recommended by the State Board for Discipline of Attorneys, although a minority of the court would disbar the respondent.

It is therefore by the court considered, ordered and adjudged

that Wilbur S. Stakes, Jr., be and he is hereby suspended from the practice of law for an indefinite period. Costs of this proceeding are taxed to the respondent.