No. 56,100

No. 56,330

STATE OF KANSAS, *Petitioner*, v. LOREN HOHMAN, JR., *Respondent.*
(686 P.2d 122)

Opinion filed July 13, 1984.

*John C. Frieden,* of Ralston & Frieden, of Topeka, argued the cause and was on the brief for the respondent.

*Roger N. Walter,* disciplinary counsel, argued the cause and was on the brief for the petitioner.

*Per Curiam:* Two separate complaints were filed against Respondent Loren Hohman, Jr., an attorney admitted to practice law in the State of Kansas. These two cases are consolidated in this opinion.

In the first complaint, case No. 56,330, the hearing panel made these findings of fact:

"1. Loren Hohman, Jr., is an attorney at law duly licensed to practice law in the State of Kansas and in the United States District Court for the District of Kansas. Respondent is a graduate of West Point and after serving in the Special Forces in Vietnam, he returned to Topeka, Kansas, where he entered law school at Washburn in Topeka and graduated in [1973] with a Juris Doctorate Degree. Respondent subsequently commenced practicing law. In 1972, he was elected to the House of Representatives and served in that capacity until 1980 when he elected not to run for re-election. The majority of respondent's practice is in the area of real estate law.

"2. Monarch Manufacturing, Inc. was a Kansas corporation engaged in the business of manufacture and retail sale of water beds. Monarch operated retail

sales stores in Wichita, Junction City, and Topeka. Richard L. Howard was employed by Monarch as manager of its retail stores. Howard was so employed until December of 1980.

"3. Howard, in his capacity as manager of the retail stores and as agent for Monarch, arranged for radio broadcast advertising from Harris Enterprises, Inc., which operated KTOP (AM) and KDVV (FM).

"4. On February 19, 1981, Harris Enterprises commenced legal action against Monarch Manufacturing, Inc. and Richard L. Howard seeking judgment on a debt owed in the amount of $5512.70, Case No. 81-CV-240, District Court of Shawnee County.

"5. Soon after being served with summons, Howard consulted with respondent concerning the pending legal action. Respondent agreed to represent Howard in Case No. 81-CV-240. Howard did not feel he was liable on the debt because at the time the advertising services were ordered, he was acting as an employee and agent, and he contended Harris Enterprises knew that. On March 11, 1981, respondent, on behalf of Howard, filed an answer generally denying the allegations of the petition and further asserting the defense that Howard merely acted as an employee of Monarch and was not liable for the debt alleged.

"6. On May 18, 1981, plaintiff's counsel served requests for admissions on respondent pursuant to K.S.A. 60-236. Attached to the requests were copies of printed order forms for the purchase of advertising with KTOP (AM) and KDVV (FM). The orders were made out to the account of Monarch Mattress Co. and purportedly signed by Howard. The orders were dated from April 1, 1980, through August 9, 1980. The requests asked the defendant to admit that the documents were authentic, that Howard signed them, and finally asked Howard to admit that he was liable on the debt.

"7. Also on May 18, 1980, plaintiff's counsel filed a motion to dismiss without prejudice against Monarch Manufacturing, Inc., for the reason that Monarch had filed a Chapter 11 Bankruptcy.

"8. The certificate of service on both the requests for admissions and the motion to dismiss the claim against Monarch reflects that the respondent was served with a copy of both these documents.

"9. Respondent testified that he wrote four letters to Richard Howard dated May 28, June 9, July 27, and August 5, 1981. (Respondent's Exhibits 1 through 4, respectively). All the letters are terse, and request that Howard get in contact with respondent and provide certain unspecified information. The first three letters are addressed to 3241 Randolph, Topeka, Kansas, and the last letter is addressed to 4645 Southwest 8th Street, Topeka, Kansas.

"10. Howard testified that at the time he first contacted the respondent in February or March of 1981, he resided at 4645 Southwest 8th Street. Howard had previously lived at 3241 Randolph, but moved to his address on Southwest 8th Street in October of [1980]. Howard was listed in the Topeka telephone directory at the 4645 Southwest 8th Street address. When Howard moved, he made the necessary arrangements to have the post office forward his mail, and his mail was routinely forwarded. Howard denied that he ever received the letters identified as Respondent's Exhibits 1 through 4.

"11. Respondent neither answered nor otherwise responded to the requests for admissions, nor did respondent make any requests for an extension of time in

which to respond to the requests for admissions, if he thought his prior consultations with Howard did not give him sufficient information to deny that Howard admitted he was liable on the debt.

"12. On September 22, 1981, plaintiff's counsel filed a motion for summary judgment based on the defendant's failure to respond to requests for admissions. K.S.A. 60-236(a) provides that a matter is admitted unless, within thirty (30) days after service of the request, or within such shorter or longer time as the court may allow, the party upon whom the request is directed serves an answer or objection.

"13. The certificate of service reflects that respondent was served with a copy of plaintiff's motion for summary judgment on the 22nd day of September, 1981. Respondent did not reply to the motion for summary judgment. Howard was not informed that the motion had been filed.

"14. On October 21, 1981, by letter addressed to both respondent and plaintiff's counsel, The Honorable Terry Bullock sustained plaintiff's motion for summary judgment and entered judgment against Richard Howard in the amount of $5,512.70. That judgment was filed October 22, 1981. Respondent did not advise Howard that judgment had been entered against him. Howard did not otherwise learn of that judgment having been entered.

"15. A certified copy of the Court file in Case 81-CV-240 (Complainant's Exhibit 1) reflects that the plaintiff made application to examine the judgment debtor, and Howard was ordered to appear for a hearing in aid of execution on November 25, 1981. Howard testified that he did not receive a copy of this order and was not advised that he was to appear.

"16. For some unexplained reason, Howard was served with the petition in Case 81-CV-240 a second time. The file reflects that alias summons was issued on December 9, 1981 and that Howard was again served with the petition on December 14, 1981. Howard took the petition to the respondent. Respondent told Howard he would take care of it. Howard testified this was the second time Howard had any contact with respondent in this case, the first being when he initially consulted the respondent after first being served with summons as set out in paragraph 5 *supra*. Respondent filed an answer to the second petition on January 13, 1982. Both petitions served on Howard were identical, as were both answers filed by the respondent.

"17. Plaintiff again made application to examine Howard, and Howard was ordered to appear at a hearing in aid of execution on February 19, 1982. Howard was served a copy of the order on January 29, 1982, by a sheriff's deputy at his home at 4645 Southwest 8th Street, Topeka, Kansas. Howard for the first time became aware that a judgment might have been entered against him when served with this order.

"18. Immediately after being served with the order as set out above, Howard contacted the respondent and inquired as to what course of action he should take. Respondent advised Howard he would take care of it.

"19. Not having heard from the respondent, on February 18, 1982, Howard contacted respondent about the hearing set for the following day. At this meeting, respondent advised Howard to phone Judge Bullock, tell the Judge that Howard would be out of town, and request a continuance. Howard followed these instructions. Judge Bullock advised Howard that a continuance was agreeable to him if plaintiff's counsel consented. Howard contacted plaintiff's counsel, Vic

Miller. Miller advised Howard he needed to talk to the respondent. Howard again contacted the respondent. On this occasion, respondent advised Howard not to worry about the notice to appear and that he would take care of matters.

"20. On March 8, 1982, Howard was served with a citation to appear before Judge Bullock on April 2, 1982, and show cause why he should not be held in contempt for failure to appear as previously ordered.

"21. On or around March 31, 1982, Howard contacted another Topeka attorney, Michael E. Francis, to represent him on matters pending in Case 81-CV-240. Howard advised Francis that he had been represented in this matter by the respondent. Francis arranged a meeting with Howard the following day. On April [1,] 1982, Francis personally contacted respondent to see if he had any objection to Francis representing Howard. Respondent replied that he had withdrawn as counsel in the case and had no objection to Francis representing Howard.

"22. Subsequently on April 1, 1982, Francis met with Howard. After their meeting, both went to the Shawnee County Courthouse and examined the Court file in Case 81-CV-240. The file reflected that the respondent had not withdrawn as counsel. This was the first time Howard was advised as to the status of the case, or was apprised of the requests for admissions, or motion for summary judgment filed.

"23. Subsequently, Francis entered his appearance on behalf of Howard in Case 81-CV-240, and obtained a continuance of the contempt citation hearing. Thereafter, Francis filed a motion to set aside the judgment against Howard, and a memorandum in support. (Complainant's Exhibit 1) Howard executed an affidavit which was attached to the motion and memorandum. This affidavit is consistent with Howard's testimony before the Hearing Panel.

"24. Judge Bullock ultimately denied the defendant's motion to set aside the judgment, and summary judgment against Howard in the amount of $5,512.70 remained in effect. Howard ultimately filed for bankruptcy and this judgment and underlying debt was discharged pursuant thereto."

The next case, No. 56,100 arose from respondent's representation of Thomas Roth. The formal disciplinary complaint was filed July 26, 1982, and a disciplinary hearing was held November 22, 1982. The hearing panel recommended respondent be suspended from the practice of law for an indefinite period. The respondent filed exceptions and the matter is now before this court.

On December 27, 1979, respondent's client, Thomas Roth, suffered injury to his jaw as a result of biting into a plastic object contained in a candy bar. Mr. Roth retained respondent to represent him in an action against the manufacturer of the candy bar. Over the next several months progress on the case was slow. In late November or early December, 1980, Mr. Roth spoke with respondent. Respondent told Roth he would give the manufac-

turer's insurance company until December 23, 1980, to settle or he would file suit.

On December 23, 1980, Roth phoned respondent to inquire as to whether a settlement had been reached. Respondent answered by inquiring whether Roth would "settle for $10,000." Roth told his attorney to "go ahead." Roth also asked respondent if he should purchase items for Christmas. Respondent allegedly told Roth: "Go ahead and get whatever you want and don't worry about it." Respondent denied telling Roth to purchase Christmas presents based upon an imminent settlement.

After that conversation Roth did not hear from respondent. After several unsuccessful attempts to contact him, Roth finally wrote respondent a letter on February 27, 1981, inquiring as to the status of the settlement. He received no response. On March 19, 1981, Roth wrote a second letter urging a response from his attorney. He mentioned he had overdue dental bills which had been incurred based upon respondent's advice. Roth also stated that unless the matter was concluded by March 25, 1981, he would terminate his representation by respondent. Roth received no response.

On March 27, 1981, Roth again wrote respondent and terminated his employment. Roth advised that his new attorney would be in contact and requested respondent provide the new attorney with Roth's file and other property.

During this time the candy bar manufacturer's insurance representative, Betty Bonnell, had received a letter from respondent dated November 12, 1980. After receiving the letter, Bonnell spoke on the phone with respondent several times. She attempted unsuccessfully to arrange a meeting. Bonnell testified respondent did not discuss any specific settlement terms nor did he threaten the commencement of litigation. On March 25, 1981, Bonnell wrote respondent requesting information concerning the case. Respondent did not reply.

Roth's new attorney, John Bryan, spoke with respondent on April 8, 1981. Bryan confirmed respondent's termination as Roth's attorney, but also discussed the possibility of respondent settling the case. Respondent implied a settlement was imminent. Bryan told respondent that if settlement was offered for $10,000, to accept it.

Bryan then sought Roth's file from respondent. After several letters and calls extending into August 1981, Bryan informed

respondent he was contacting the candy bar manufacturer. Respondent still did not reply.

Bonnell, who had been continually trying to contact respondent, received a copy of Bryan's letter to the manufacturer. She wrote to Bryan expressing confusion as to who was representing Roth. She also requested the information which she had not been able to obtain from respondent.

During this time, Bryan was attempting to obtain evidence in the case which Roth had provided to respondent's office in 1980. Respondent informed Bryan the evidence was in his father's safe and he, therefore, did not have access to it. Respondent meanwhile wrote Bonnell on November 16, 1981, stating he was making one final attempt to settle the matter. He indicated he had the evidence which he had informed Bryan he did not have access to.

After being informed of this development by Bonnell, Bryan wrote respondent requesting that he write Bonnell indicating Hohman no longer represented Roth. Bryan again requested the return of the evidence and the documents concerning the case which respondent possessed. These were given to Bryan shortly after December 1, 1981.

On December 15, 1981, Bryan filed suit against the candy manufacturer. This suit was still pending at the time of the disciplinary hearing.

The panel concluded respondent violated DR 6-101(A)(3) (232 Kan. clxxxvi) on both complaints by neglecting a legal matter entrusted to him. The panel further found respondent engaged in conduct involving misrepresentation and deceit in violation of DR 1-102(A)(4) (232 Kan. clxxv) and in conduct which adversely reflected on his fitness to practice law in violation of DR 1-102(A)(6) (232 Kan. clxxv) in connection with the second complaint in case No. 56,100.

The respondent contends the findings of fact do not support the conclusion he neglected a legal matter. With this contention we disagree.

The standard of proof to warrant a finding of attorney misconduct requires the charges be established by substantial, clear, convincing and satisfactory evidence. *State v. Scott,* 230 Kan. 564, 570, 639 P.2d 1131 (1982). We defined "attorney neglect" in *State v. Dixon,* 233 Kan. 465, Syl. ¶ 2, 664 P.2d 286 (1983):

"Neglect involves indifference and a consistent failure to carry out the obligations which the lawyer has assumed to his client or a conscious disregard for the responsibility owed to the client. . . . Neglect cannot be found if the acts or omissions complained of were inadvertent or the result of an error in judgment made in good faith."

In the first complaint the evidence presented to the hearing panel established respondent consistently failed to fulfill his responsibilities to Richard Howard, one of his clients. There was no evidence the neglect was inadvertent or the result of an error in judgment.

In the second complaint it is clear respondent did not reply promptly to inquiries from his client, Thomas Roth, or from the insurance company claims adjuster or from Mr. Bryan, the attorney who replaced him in the case. Respondent's failure to promptly communicate with all of these persons created many legal problems which could have culminated in the loss of Roth's claim. This amounts to neglect of a legal matter.

We have no hesitation in adopting the hearing panel's conclusion respondent neglected a legal matter entrusted to him in both complaints.

The complaint that respondent engaged in conduct involving misrepresentation and deceit also arose from his failure to communicate with his client and his continued representation of Roth after he was terminated. Respondent's misleading suggestions to Roth that settlement was imminent, coupled with his failure to correct Roth's belief the settlement proceeds were on the way, constitute misrepresentation. All of these infractions were prejudicial to the administration of justice and reflect adversely on respondent's fitness to practice law.

The evidence clearly and convincingly supports the conclusions of the hearing panel.

In both cases the hearing panel recommended respondent be indefinitely suspended from the practice of law. Respondent argues this is too harsh a penalty in this case and offers evidence of mitigating circumstances. The evidence was that he had been a careful, conscientious, legal practitioner until this two- or three-year period of his life. He argues, and offered evidence in support of his argument, that the cause of his disciplinary rule violations was that his mother was diagnosed as having cancer and his father and mother moved to Hawaii for treatment of the illness. Not only was his mother's illness a problem for him, but

he also was required to take over the complicated family businesses, all of which proved too much for him to properly handle.

In *State v. Scott,* 230 Kan. 564, 572, we examined the factors to be considered in assessing punishment in lawyer discipline cases:

"(1) Whether restitution has been made; (2) previous violations or the absence thereof; (3) previous good character and reputation in the community; (4) the present or past attitude of the attorney as shown by his cooperation during the hearing and acknowledgement of the transgression; (5) letters from clients, friends and lawyers in support of the character and general reputation of the attorney; and (6) any statement by the complainant expressing satisfaction with any restitution made and requesting no discipline. 7 Am. Jur. 2d, Attorneys at Law § 52, p. 112; *State v. Stakes,* 227 Kan. 711, 608 P.2d 997 (1980) (aggravating or mitigating circumstances); *State v. Leon,* 229 Kan. 178, 621 P.2d 1016 (1981) (previous record of professional conduct); *In re Ratner,* 194 Kan. 362, 399 P.2d 865 (1965) (testimony as to attorney's reputation and character)."

An addition to the foregoing list of mitigating factors is that of personal misfortunes of the attorney if such misfortunes have contributed to a violation of the Code of Professional Responsibility. *State v. Martin,* 231 Kan. 481, 486, 646 P.2d 459 (1982).

We have reviewed all of these factors and taken into consideration respondent's prior good conduct and good reputation in the community. Also we have considered the effect on respondent of the illness of his mother, and the pressure of having to take over the family businesses. Based upon these mitigating circumstances we conclude the hearing panel's recommendation of indefinite suspension from the practice of law be rejected and instead respondent be suspended from practicing law for a period of ninety days.

It Is Therefore Considered, Ordered and Adjudged by the Court that Loren Hohman, Jr., be and he is hereby suspended from the practice of law for a period of ninety days. The costs of this proceeding are taxed against the respondent and are ordered paid forthwith.

This order becomes effective upon the filing of this opinion with the Clerk of the Supreme Court.