No. 84,188

In the Matter of THOMAS J. LEISING, *Respondent*.

(4 P.3d 586)

Opinion filed April 21, 2000.

*Edwin A. Van Petten*, deputy disciplinary administrator, argued the cause and was on the brief for petitioner.

*John J. Ambrosio*, of John J. Ambrosio, Chartered, of Topeka, argued the cause, and *Kathleen A. Downey*, of the same firm, was with him on the brief for respondent. *Thomas J. Leising*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Thomas J. Leising of Topeka, an attorney who has been admitted to the practice of law in Kansas. The formal complaint concerns respondent's service as guardian and conservator of an incapacitated person. The matter was heard by the panel on stipulated facts and exhibits. Evidence was presented as to the existence of aggravating and mitigating circumstances. The panel concluded respondent had violated KRPC 1.14 (1999 Kan. Ct. R. Annot. 341) (client under a disability) and KRPC 8.4(c), (d), and (g) (1999 Kan. Ct. R. Annot. 399) (misconduct). The panel recommended the discipline of indefinite suspension.

Respondent has filed exceptions, and his purpose therein is stated in his brief as follows:

"While Respondent has stipulated to the violations alleged by the Disciplinary Administrator's Office in its Formal Complaint, Respondent submits that there are some factual errors in the Final Hearing Report which are significant enough to warrant correction when considering the appropriate discipline in this matter."

## FACTS

As these exceptions do not challenge the facts underlying the specific violations, we need not recite herein the full factual details found by the panel. The facts may be summarized as follows. W.T., born January 29, 1948, has a long history of mental illness. In 1979, on petition filed by his mother, W.T. was found to be an incapac-

itated person, and a Topeka attorney, Ira Dennis Hawver, was appointed his guardian and conservator. The ward's annual income was less than $500. In April 1985, two matters of significance occurred: respondent was appointed successor guardian and conservator; and the ward became the beneficiary of a substantial family trust.

The annual accounting filed by respondent for the period June 20, 1996, through June 16, 1997, gave rise to the proceedings herein. The district judge reviewed the accounting and held two hearings. In the second hearing, the examination was conducted by an assistant attorney general. Improper expenditures from the ward's funds were found to have been made by the respondent, and he was removed as guardian and conservator. Respondent was ordered to pay $60,000 (double the amount of the loss) to the conservatorship. This sum has been paid. Respondent reimbursed the bonding company the $30,000 it had paid into court. The remaining $30,000 was paid by the ward's mother pursuant to a private agreement between respondent and the ward's mother under which respondent is to work it off by continuing to provide personal services to the ward.

The expenditures found to be improper may be summarized as follows:

1.   Trip to New York by respondent and the ward costing in excess of $6,774.65, including airline tickets ($2,328), Plaza Hotel ($4,231), four Broadway shows, ground transportation ($215.65).

2.   Meals in the amount of $948.32 for ward, respondent, respondent's wife and/or respondent's children: Annie's Santa Fe ($49.69), ($42.79), ($57.09), ($38.59), ($53.69), Olive Garden ($35.78), ($35.66), J.J.'s Bistro ($152.87), Saguaro Grill ($43.80), Houlihans ($51.85), Teller's ($54.44), Outback Steak House ($80.37), ($114.24), ($137.46).

3.   Payment at $15 per hour to Gwen Prosser (respondent's wife) to take the ward shopping. Annual accounting shows 49 separate entries of payments totalling $11,531.71

4.   Two trips to Baby Dolls (referred to as a night club by the court) by respondent and ward on cash credit card advances

of $250 and $220, incurring a service charge ($65 cash returned to estate).

5.   Houston trip for respondent and ward ($845 airfare).

6.   Two trips to Cancun, Mexico, in the spring of 1997. Respondent and his wife and the ward went on the first trip. These three, plus respondent's stepdaughter, went on the second trip. Costs were: airline tickets ($14,106.14) and hotel ($12,181.52).

7.   Payment of $338.85 to Betty Jones, respondent's legal secretary, for arranging medical appointments, for transporting ward thereto and waiting for him for return transportation.

8.   April 1997 trip by respondent to Atlanta which respondent stated was to meet with trust officials. In a letter to the trust officials, however, he stated the trip was to "combine a bit of business with [a] baseball trip."

9.   Payment for numerous items of women's clothing and footwear for members of respondent's family, including The Limited ($136.50), Lady Footlocker ($127.36), ($49.87), ($146.47), and ($196.24), Courtney's ($95.73), Dillards ($93.41), ($297.33), and ($235.65), and Jones Store ($106.13) and ($140.07). Total cost was in excess of $1,600.

10.   Purchase of six tickets (unused) to *I Hate Hamlet* for ward, respondent, and four members of respondent's family ($174). Purchase of six tickets to *Forever Plaid* ($96) for ward, respondent's family, and friends.

11.   Hosting a birthday party with his wife for the ward for which respondent reimbursed himself $615.38.

In connection with these expenditures respondent was charged in 1999 with a violation of K.S.A. 21-3437(a)(2) (mistreatment of a dependent adult) (a class A person misdemeanor). This case ended in a diversionary agreement in which respondent stipulated to the charge he had knowingly and intentionally taken unfair advantage of the ward, a dependent adult, by using or taking the physical or financial resources of the ward for his personal or financial advantage by use of undue influence, coercion, harassment, duress, deception, false representation, or false pretense.

## EXCEPTIONS

Respondent takes exception to the panel's finding that when he became conservator, the ward's estate was valued "in excess of $2,000,000". He states that the figure for the value at that time was $465,000. This correction is made, although it is a tangential matter having no bearing on any issues herein.

Respondent filed exception to the panel's findings that respondent's expenditures for the New York and Houston trips and for the services of his secretary Betty Jones were not approved by the court. These exceptions are without merit. No court approval of these expenditures has been demonstrated. The accounting in which they are contained was disapproved.

In his final exception, respondent complains of the footnote in the Final Hearing Report, which states that a report on other conservatorships of respondent's revealed some "transgressions, but on a lesser scale." This report was prepared by a Topeka attorney at the request of respondent's attorney. The report is dated several months after the court hearings and court decision herein. In this exception respondent states:

"Respondent takes exception to this footnote as it indicates that Ken Carpenter's report reveals minor 'transgressions' or ethical violations. However, Judge Yeoman relied on Ken Carpenter's report to allow the respondent to continue to be conservator on all of his cases except [W.T.]'s. If the Court believed the report from Mr. Carpenter revealed any transgressions or ethical violations, no matter how minor, Respondent believes the Court would not have allowed him to continue as conservator on any other files."

It is unclear how or if the report was ever before the district court. In any event the report is not a blanket approval of respondent's handling of other conservatorships. Illustrative of some statements therein is the following:

"There are regular references to persons to whom Mr. Leising has made payment for certain services apparently provided to the conservatee. These persons who provided such services should be identified more clearly. If these persons are employed by Mr. Leising in the normal course of his business, it may not be proper to compensate them separately unless specific description is made of the services performed by this individual for the benefit of the conservatee. If these services are those for which Mr. Leising is being compensated, additional compensation would be improper."

Other than the value of the estate at the time respondent took control thereof, we find no merit in the exceptions filed herein.

The matter was heard by the panel on stipulated facts, stipulated exhibits, and a stipulation that respondent had violated KRPC 1.14, 8.4(d), and 8.4(g). Respondent denied he had violated KRPC 8.4(c). He has filed no exception to the panel's conclusion that KRPC 8.4(c) had also been violated. For convenience, KRPC 8.4 (misconduct) is set forth herein in pertinent part:

"It is professional misconduct for a lawyer to:

. . . .

"(c)   engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

"(d)   engage in conduct that is prejudicial to the administration of justice;

. . . .

"(g)   engage in any other conduct that adversely reflects on the lawyer's fitness to practice law."

The facts as found by the panel (with one exception as to beginning value of the estate) are supported by clear and convincing evidence in the record and support the violations found herein.

## DISCIPLINE

We turn now to a determination of the appropriate discipline to be imposed. The panel and the Disciplinary Administrator's office recommend indefinite suspension. Respondent seeks the alternative of supervised probation. At the hearing before the panel, the proposed supervising attorney and respondent's psychologist each testified in favor of the plan, as did respondent. The ward's mother also testified in favor of respondent.

The psychologist testified that respondent was an individual trying to please everybody — the ward as well as respondent's family. Apparently respondent rationalized his actions as not hurting anyone and bringing happiness to those he wanted so much to please. He further testified respondent was drinking to excess during the relevant time period but was not impaired.

In *In re Bailey*, 268 Kan. 63, 986 P.2d 1077 (1999), we discussed the determination of appropriate discipline as follows:

"This court is not bound by the recommendation of either the Disciplinary Administrator or of the hearing panel. Supreme Court Rule 212(f) (1998 Kan. Ct. R. Annot. 236); see *In re Jones,* 252 Kan. 236, 239, 843 P.2d 709 (1992). This court has a duty in disciplinary proceedings to examine all the evidence and to determine the judgment to be entered. *State v. Klassen,* 207 Kan. 414, 415, 485 P.2d 1295 (1971).

"In *Jones,* we noted that '[c]omparison of past sanctions imposed in disciplinary cases is of little guidance.' 252 Kan. at 239. It is not helpful, therefore, for the respondent to point out past disciplinary actions in the hopes that the disposition for this case will be similar. Each case should be evaluated based on its specific facts and circumstances. In determining the appropriate discipline to be imposed for violating the disciplinary rules, we consider the facts surrounding the violation as well as any aggravating or mitigating circumstances. *State v. Stakes,* 227 Kan. 711, 720, 608 P.2d 997 (1980).

"The ultimate goal of disciplinary proceedings is to protect the public. *Jones,* 252 Kan. at 239. Additionally, the disciplinary proceedings give the public confidence that attorneys who violate the Kansas Rules of Professional Conduct (KRPC) are disciplined in a manner which is appropriate, given the specific circumstances of the case."

The misconduct herein is very serious. As the district court stated in its decision removing the respondent from the subject conservatorship:

"What occurred here is not materially different than what would have occurred had the conservator taken several thousand dollars in cash that belonged to the conservatee and just put that money in his own pocket. Mr. Leising now states that he recognizes this was a mistake in judgment and he should repay part of this money. It seems rather clear to me, however, that, since there was no mention of these trips in the itemization and this information only came out when the appointed attorney began asking for detail, that this wasn't just a mistake in judgment. It was a misuse of funds and an attempt to deceive the court about what had happened."

## RECOMMENDATION

The panel's recommendation as to discipline is as follows:

"In making its recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter "Standards"). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated the duty owed to [W.T.] to preserve funds of the estate. As conservator, the Respondent was placed in a position of

trust. He chose to violate that trust and the duty owed to [W.T.] by misusing conservatorship funds. The Respondent also violated the duty owed to the public, the legal system, and to the profession to maintain honesty and personal integrity by trying to deceive the District Court by filing an annual accounting which attempted to conceal how conservatorship monies were spent.

"*Mental State.* A careful review of the accounting filed with the District Court clearly evidences that the Respondent's misappropriation and conversion of [W.T.]'s property was intentional. *See* Disciplinary Administrator's Exhibit A. In the accounting, the Respondent failed to provide sufficient identifying information that would allow the Court to fully understand the nature of the many expenditures made by the Respondent on behalf of [W.T.] and what turned out to be expenditures made by the Respondent on behalf of himself and his family.

"*Injury.* As a direct result of the Respondent's professional misconduct, [W.T.]'s estate was depleted by more than $30,000.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In determining the recommended discipline, the Hearing Panel found the following aggravating factors present:

"*Dishonest or Selfish Motive.* While the Respondent maintained, and [M.T.] ([W.T.]'s mother) confirmed, that [W.T.] requested that the Respondent make various improper expenditures, as a fiduciary, it was incumbent upon the Respondent to resist the temptation of [W.T.]'s money. The Respondent's violation of his fiduciary duties promoted his own self-interest and clearly establishes a selfish motive.

"*Pattern of Misconduct.* The Respondent's pattern of misconduct spanned the entire accounting period, from June 20, 1996, through June 16, 1997, and included various improper types of expenditures.

"*Vulnerability of Victim.* In 1979, [W.T.] was declared to be in need of a guardian and conservator. Clearly, [W.T.] was and is vulnerable.

"*Substantial Experience in the Practice of Law.* The Respondent was admitted to the practice of law in the state of Kansas in 1979. At the time of the misconduct, the Respondent had practiced law for 17 years.

"*Illegal Conduct.* As a result of the Respondent's conduct, he was charged with the crime of mistreatment of a dependent adult, a Class A person misdemeanor, and entered into a diversionary agreement therefor.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In determining the recommended discipline, the Hearing Panel found the following mitigating circumstances present:

"*Absence of a Prior Record of Discipline.* The Respondent has not previously been disciplined.

"*Cooperative Attitude Toward Proceedings.* After the proceedings in the District Court probate case were completed, the Respondent self-reported the violations to the Office of the Disciplinary Administrator. Throughout the investi-

gation and prosecution, the Respondent has cooperated fully with the disciplinary authorities.

"*Good Character or Reputation.* As evidenced by Respondent's Exhibits C, D, E, 1, 2, 3, and 4, the Respondent enjoys the respect and support of [M.T.] and his colleagues in the legal profession. The Respondent also donates substantial amounts of time and energy to the mentally disabled.

"*Remorse.* At the hearing on this matter, the Respondent expressed genuine remorse for misappropriating [W.T.]'s funds and for violating the Kansas Rules of Professional Conduct."

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered Standard 4.1. That standard provides, in pertinent part:

"Absent aggravating or mitigating circumstances, upon application of the factors set out in [Standard] 3.0, the following sanctions are generally appropriate in cases involving failure to preserve client property:

"4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

"4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client. [Citation omitted.]

"In *State v. Sullivan*, 236 Kan. 307, 689 P.2d 910 (1984), the Supreme Court was faced with a case similar to the instant case. In *Sullivan*, the Respondent 'borrowed' approximately $1,263 from the funds of the conservatorship. *Id.* In that case, as in the case at hand, the Respondent repaid the estate prior to the imposition of any discipline. Because of the seriousness of misappropriation and conversion of conservatorship funds, the Supreme Court suspended Sullivan's license to practice law indefinitely. In reaching its decision the Court stated:

'The misappropriation and conversion of a client's funds or property is one of the most serious breaches of the Code of Professional Responsibility. Such a violation may never be condoned and only the most unusual circumstances will justify less than maximum sanctions.'

*Id.*, at 307-08.

"The Respondent and his counsel presented a compelling case which warrants consideration by this Hearing Panel. Although their evidence in mitigation falls short of 'the most unusual circumstances,' it is for that reason the Hearing Panel does not recommend disbarment. It is the unanimous recommendation of the Hearing Panel that Respondent be indefinitely suspended from the practice of law in the State of Kansas. Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

It is difficult to conceive of a more serious violation than what is before us. The district court determined the individual to whom these monies belonged was not competent to manage his own funds. Respondent was appointed by the court to serve as his con-

servator, managing the assets under the supervision of the court. Thus, the highest of fiduciary duties were imposed upon respondent. The fact that the ward may have encouraged some of the improper expenditures does not mitigate the wrongdoing herein. Further, conservatorships are normally nonadversarial proceedings, accountings filed there are not usually subjected to the intense examinations as would be present in adversarial proceedings. Courts and wards are heavily dependent on the honesty and integrity of the conservator.

Here, respondent paid entertainment, dining, and vacation expenses for not only himself but members of his family from the ward's funds. Clothing for members of respondent's family was bought at the ward's expense. Respondent paid his wife over $11,000 to take the ward shopping. He did not advise the court that this individual was his wife. There was a lengthy course of conduct here in which the respondent used the ward's funds to finance a lavish lifestyle for himself and his family and filed an accounting which was intended to deceive the court as to the true nature of the expenditures.

The real issue is whether the appropriate discipline is indefinite suspension or disbarment. Probation is a wholly inappropriate discipline under the facts herein. After careful consideration we will accept the discipline recommended by the panel and the Disciplinary Administrator's office and impose the discipline of indefinite suspension, to commence upon the filing of this order.

IT IS THEREFORE ORDERED that respondent, Thomas J. Leising, be indefinitely suspended from the practice of law.

IT IS FURTHER ORDERED that respondent shall comply with the provisions of Supreme Court Rule 218 (1999 Kan. Ct. R. Annot. 250) and, if respondent seeks reinstatement, he shall comply in full particulars with Supreme Court Rule 219 (1999 Kan. Ct. R. Annot. 260).

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports and that respondent pay the costs of these proceedings.