No. 86,384

In the Matter of JOHN LLOYD SWARTS, III, *Respondent.*
(30 P.3d 1011)

Opinion filed September 14, 2001.

*Alexander M. Walczak*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with him on the brief for petitioner.

*Zachery E. Reynolds*, of The Reynolds Law Firm, P.A., of Fort Scott, argued the cause and was on the brief for respondent, and *John Lloyd Swarts, III*, respondent, argued the cause pro se.

*Per Curiam:* This is an original contested proceeding in discipline filed by the office of the Disciplinary Administrator against respondent John Lloyd Swarts, III, of Fort Scott, Kansas, an attorney admitted to practice law in Kansas.

This matter was heard by a duly appointed panel of the Kansas Board for Discipline of Attorneys on August 30, 2000, which rendered a comprehensive and factually explicit 26-page report, making specific findings of fact and conclusions of law.

Respondent was charged by the Disciplinary Administrator in seven separate counts: Count I, State of Kansas v. Billy Joe Gray; Count II, Awbrey Hawpe; Count III, Mark Briggs; Count IV, Dale Leland Gardner, Jr.; Count V, Raul Reyes and juveniles; Count VI, "Board of Discipline"; and Count VII, State v. Weeter.

The Disciplinary Administrator alleged the respondent violated KRPC 1.1 (2000 Kan. Ct. R. Annot. 300) (competent representation), KRPC 3.3 (2000 Kan. Ct. R. Annot. 385) (candor toward tribunal), KRPC 3.4(c) and (e) (2000 Kan. Ct. R. Annot. 389) (fairness), KRPC 3.8 (2000 Kan. Ct. R. Annot. 397) (special responsibilities of a prosecutor), and KRPC 8.4(a), (d), and (g) (2000 Kan. Ct. R. Annot. 420) (misconduct) in Count I; KRPC 8.4(a) in an attempt to violate KRPC 3.3 and 8.4(c) (candor and misconduct), in Count II; KRPC 1.1, KRPC 3.7 (2000 Kan. Ct. R. Annot 395) (lawyer as witness), KRPC 4.2 (2000 Kan. Ct. R. Annot. 400) (communicating with person represented by counsel), and KRPC 8.4(a),

(d), (e), and (g) in Count III; KRPC 3.8(c), KRPC 4.3 (2000 Kan. Ct. R. Annot 401) (dealing with unrepresented person), and KRPC 8.4(d) in Count IV; KRPC 8.4(d) and (g) in Count V; KRPC 3.5(d) (2000 Kan. Ct. R. Annot. 392) (undignified or discourteous conduct degrading to tribunal), and KRPC 8.4(d) and (g) in Count VI; and KRPC 3.5(d), KRPC 8.4(d) and (g), and KRPC 3.8(a) in Count VII.

The respondent stipulated to the facts set forth in the formal complaint as amended by his answer. Respondent also stipulated to violations of KRPC 1.1, 3.4(e), and 8.4(a),(d), and (g) in the *Gray* case (Count I). Respondent presented testimony in his own behalf, the matter was argued by the parties, and the hearing panel found by clear and convincing evidence as follows:

### "FINDINGS OF FACT

"1. John L. Swarts, III (hereinafter 'the Respondent') is an attorney at law, Kansas Attorney Registration No. 11994. His last registration address with the Clerk of the Appellate Courts of Kansas is . . . Fort Scott, Kansas. . . .

"2. In 1994, the Respondent was appointed to serve as the Bourbon County Attorney, replacing Michael Coffman, who had resigned from office to return to the private practice of law. From 1994, through the present time, the Respondent has remained as the Bourbon County Attorney.

#### "*Gray Case*

"3. On July 21, 1994, the Fort Scott police were called to Bobby Joe Gray's apartment on two separate occasions within a relatively brief period of time. Based upon the information obtained, a search warrant was issued and executed upon Mr. Gray's apartment. Items seized from various locations throughout the apartment included a small amount of marijuana and seeds, numerous items of drug paraphernalia, including syringes and spoons, and items indicative of drug trafficking.

"4. Kimberly Tindel, Mr. Gray's live-in girlfriend, and Carla Ragan, a friend and neighbor of Mr. Gray, were charged with drug offenses. Later, Mr. Gray was also charged with drug offenses.

"5. Generous plea agreements were made with Ms. Tindel and Ms. Ragan in exchange for their testimony against Mr. Gray. At trial, the Respondent relied heavily on the testimony of Ms. Ragan and the theory of constructive possession by Mr. Gray. Ms. Tindel's testimony was favorable to Mr. Gray. Suffice it to say, the evidence against Mr. Gray was not overwhelming.

"6. The jury convicted Mr. Gray, and he appealed his convictions to the Kansas Court of Appeals. The Kansas Court of Appeals reversed and remanded the case

for a new trial finding that the Respondent had engaged in prejudicial prosecutorial misconduct. *State v. Gray*, 25 Kan. App. 2d 83, 88, 958 P.2d 37 (1998).

"7. The prosecutorial misconduct consisted of a comment made by the Respondent during his cross-examination of Mr. Gray regarding evidence of syringe use, improper cross-examination of Mr. Gray, and improper comments made during the closing argument.

a. Cross-Examination of Defendant. The following exchange occurred on the third day of Mr. Gray's jury trial, between the Respondent and Mr. Gray. The Kansas Court of Appeals found that the Respondent engaged in prosecutorial misconduct, based upon this exchange:

'Q. Do you recall ever seeing that syringe before?

'A. No, I have not.

'Q. All right. And you don't use those items.

'A. I have in the past, yes, I have—I ain't saying I haven't—but I quit.

'Q. When did you quit?

'A. I quit like a month—probably a month and a half prior to any of this happening.

'Q. Yet when you were in here—let me see your arms. Would you show me your arms.

'A. See anything in there?

'Q. Sure saw a lot more on the day we arrested you.'

The last statement made by the Respondent was made out of the hearing of the trial judge. The Respondent had his back to the judge and counsel for Mr. Gray. Counsel for Mr. Gray made a timely objection. The objection was sustained. However, the jury was not admonished to disregard the comment until immediately preceding their deliberations. The Kansas Court of Appeals noted that 'the remark is so prejudicial as to be classified as incurable by the later jury admonition, particularly one which came at the very close of the trial, immediately before the jury retired for deliberation.' *State v. Gray*, 25 Kan. App. 2d at 87.

b. Preliminary Hearing Evidence. During his cross-examination of Mr. Gray, the Respondent questioned Mr. Gray regarding evidence presented at the preliminary hearing. However, the preliminary hearing evidence was not admitted into evidence at the trial.

c. The Respondent's Closing Argument. The Court of Appeals found that four areas of comment by the Respondent in his closing argument went 'beyond the scope of fair comment on the evidence, even considering the wide latitude given a prosecutor in closing statement.' *Id.* at 88. Specifically, the Court found that the Respondent improperly (1) gave his personal belief regarding Mr. Gray's guilt, (2) commented that he found drug money in other irrelevant cases, (3) offered evidence from the preliminary hearing regarding Mr. Gray's guilt even though the evidence had not been admitted into evidence, and (4) implied that Mr. Gray was infected with HIV.

(1) The Respondent made improper comments regarding his personal beliefs. In arguing his case to the jury, the Respondent said: 'I wanted what I thought

was the kingpin, and I let a couple of other small fry all off the hook.' Later, the Respondent said: 'I traded for their testimony. I let them off the hook because I wanted the kingpin—what I thought was the kingpin. So I got it.' Finally, the Respondent stated:

'He is not the world's kingpin. He is not the Medellin Cartel. This is just a local dealer. I want him off the street.

'I use common sense and experience. I've been charging people and looking at police reports a long time.

'And I've been walking around with my eyes open for 53 years. I don't just throw things out willy-nilly. I charge people with crimes.'

(2) The Respondent made improper references to 'drug money' he had found in other cases. During his closing argument, counsel for Mr. Gray used the lack of money found in Mr. Gray's residence to support the theory that his client was not selling drugs. In response to the comments made by Mr. Gray's counsel, the Respondent said:

'I don't know where the money went. I'd have been glad to get there early enough. I've gotten there early enough on other occasions, and we've gotten from hundreds to thousands. But in this case, we didn't find any money.

'But if I'm leaving, I don't have time to grab the weed, but I'm going to make sure I got time to grab the money, money I've got to spend. I don't know where the money went. Can't show you.'

(3) The Respondent made improper references to evidence not admitted in the case. During his closing argument, the Respondent made several references and comments regarding the evidence presented at the preliminary hearing in this case. The evidence used in the preliminary hearing was not admitted into evidence at the trial.

(4) The Respondent made improper references to 'HIV.' The Respondent provided the jury with a commentary on the syringes found in Mr. Gray's apartment, indicating that the syringes may be infected with HIV, and therefore, implying that Mr. Gray may be infected with HIV. There was no evidence introduced in the trial regarding 'HIV' or testing of the needles in question. Specifically, the Respondent stated:

'I wouldn't necessarily reach in the trash can because HIV is a killer. If I stabbed myself with one of those needles, I'd cut my finger because you can't get rid of it any other way.'

### "Manufactured Evidence Case

"8. In 1994, Fort Scott Sgt. Awbrey Hawpe investigated an allegation that James Lee Scott masturbated and ejaculated into a handkerchief in front of an employee. The handkerchief was collected as evidence and placed into a brown paper sack.

"9. The Respondent charged Mr. Scott with lewd and lascivious behavior and criminal restraint. Counsel for the defendant and the Respondent worked out a plea agreement, and on October 24, 1994, the matter was scheduled for a change of plea and sentencing hearing.

"10. Some time after the commission of the crime, but before the change of plea hearing, the brown paper sack containing the handkerchief was lost.

"11. After being informed that the evidence was lost and shortly before the change of plea hearing on October 24, 1994, the Respondent located a brown paper sack and placed his personal handkerchief into the sack. The Respondent asked Sgt. Hawpe to carry the sack containing the Respondent's handkerchief into the courtroom as though it was the missing evidence in the case. Additionally, the Respondent asked Sgt. Hawpe not to 'volunteer anything,' implying that Sgt. Hawpe should mislead the defendant about the misplaced handkerchief.

"12. Sgt. Hawpe became angry, told the Respondent that he was not going to tell a lie, and refused to take part in the Respondent's charade. Because Sgt. Hawpe would not carry the sack into the courtroom, the Respondent carried the sack and placed it on counsel table. The sack remained on counsel table throughout the change of plea and sentencing hearing.

"13. In his response to the initial complaint, the Respondent explained that he placed his handkerchief in the brown paper sack and treated the sack as if it were the missing evidence 'to heap added embarrassment on the defendant.' Additionally, the Respondent testified at the hearing on this matter, that he placed his handkerchief in the brown paper sack because he wanted Mr. Scott to believe that the evidence was not missing and could be used if Mr. Scott decided to back out of the plea agreement.

"14. The judge and Mr. Scott were never informed that the handkerchief inside the sack was the Respondent's personal handkerchief and not the evidence seized in the case.

"15. Although the Respondent acknowledges that embarrassing Mr. Scott was improper, the Respondent now asserts that, because he could have used the handkerchief as—in his words 'demonstrative evidence,' he did not engage in misconduct.

## *"Briggs Case*

"16. On May 9, 1995, the Respondent was the victim of a crime. Mark Briggs stole his trailer and its contents. On May 10, 1995, the Respondent's assistant filed a complaint charging Mr. Briggs with theft. The Respondent was endorsed as a witness on the complaint.

"17. The Respondent went to the home of Mr. Briggs' parents and informed them that if Mr. Briggs would return his property, the Respondent would reduce the charges pending against Mr. Briggs.

"18. On August 29, 1995, Mr. Briggs was arrested for the crime. Mr. Briggs' first appearance was August 30, 1995. The Respondent's assistant appeared in behalf of the state. The Respondent was also present during the hearing.

"19. On August 31, 1995, Charles Gentry was appointed to represent Mr. Briggs. On September 5, 1995, Mr. Briggs appeared with counsel for a bond review hearing. Following the hearing, outside the presence of Mr. Gentry, Mr. Briggs asked the Respondent if all he wanted was his property back. The Re-

spondent restated the offer that he had made to Mr. Briggs' parents. Mr. Briggs asked the Respondent to come see him in jail. The Respondent and Mr. Briggs scheduled a meeting at 12:30 p.m. in the jail.

"20. Opposing counsel, Mr. Gentry, learned of the Respondent's plans to have *ex parte* contact with his client. Prior to the meeting, Mr. Gentry stopped by the Respondent's office and canceled the meeting.

"21. At about this same time, the Respondent was seeking to have a special prosecutor appointed to prosecute this case. Daniel F. Meara was appointed and served in that capacity.

"22. The brief conversation between the Respondent and Mr. Briggs after the bond review hearing, including the incriminating statement, was introduced as evidence in the preliminary hearing.

"23. On three separate occasions the defendant initiated contact with the Respondent. On November 1, 1995, Mr. Briggs requested that the Respondent meet with him in the jail. Again on November 3, 1995, Mr. Briggs sent a request to the Respondent asking him to visit him in the jail. Finally, on November 8, 1995, Mr. Briggs notified the Respondent that he had information in a murder case and Mr. Briggs again asked the Respondent to visit him in jail.

"24. On November 8, 1995, the Respondent went to the jail and visited Mr. Briggs. Prior to meeting with Mr. Briggs, the Respondent attempted to contact Mr. Gentry. Because Mr. Gentry was not at home or at the office, and because the Respondent did not want to stay at the office until after 10:00 p.m., the Respondent went to see Mr. Briggs without the consent of opposing counsel. During that meeting, Mr. Briggs made additional incriminating statements regarding the theft of the Respondent's personal property.

"25. The trial court later suppressed the statements made by Mr. Briggs on September 5, 1995, and November 8, 1995.

### "Gardner Case

"26. On October 2, 1995, the Respondent charged Dale Leland Gardner, Jr. with aiding and abetting first degree murder, possession of narcotics, and conspiracy to possess narcotics.

"27. On October 6, 1995, Mr. Gardner was booked into jail. One hour before the first appearance, the Respondent went to the jail and questioned Mr. Gardner. Prior to questioning Mr. Gardner, the Respondent did not advise Mr. Gardner of his right pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1601, 16 L. Ed. 2d 694 (1966). During that conversation, Mr. Gardner made incriminating statements to the Respondent. At the first appearance hearing, counsel was appointed for Mr. Gardner.

### "Reyes Case

"28. On June 5, 1998, *State v. Raul Reyes* came on for a bond hearing. The Respondent appeared at that time, and argued against a reduced bond, reasoning that it would be easy for the defendant to travel to Mexico and blend in with the

populace. The Respondent based his comments on the defendant's name and appearance. The defendant was a United States citizen and a military veteran.

"29. The comments by the Respondent drew an objection by counsel for defendant. Additionally, a Hispanic American Corrections Officer voiced his objection to the improper comments as well.

### "Slavery Comments

"30. On May 4, 1998, following a hearing on a 'child in need of care' case, the Respondent met with various participants of the hearing, including two social workers from the Kansas State Department of Social and Rehabilitation Services (hereinafter 'SRS'), an African American teenage girl, her mother, and her aunt. During this meeting, the Respondent positioned himself a few feet from the teenager and shouted, 'Do you think slavery is over? Damn it young lady answer me, do you think slavery is over? I'm here to tell you it's not, your mother owns you until you are 18.'

"31. At the hearing on this matter, the Respondent denied that making such comments to an African American person is offensive. He denied that it was a racist statement, alleging that he did not notice the race of the child to whom he was talking and that the comment is a correct statement of the law. He maintained that the decisions of the United States Supreme Court support the view that children are chattel owned by their parents.

### "Advice to Chain Child to Bed

"32. On November 9, 1998, the Respondent, following a juvenile court hearing, advised the father of a juvenile to chain his son to the bed to allow the family to get some rest and to prevent the child from sneaking out of the house at night. The father followed the Respondent's advice and, for three nights, chained his son to the bed with a chain and padlock. As a direct result, the child was removed from the care of the father. During the hearing on this matter the Respondent maintained that his advice was fully justified. As justification he testified that the child died after being placed in the custody of SRS. The Respondent stated that the child did not die 'on my watch.'

### "Suicide Comments

"33. On April 23, 1998, a fourteen year old was placed in foster care. Social workers from the area office of the SRS contacted the Respondent and asked him to file a 'child in need of care' case. The Respondent refused to file the case and refused to examine additional information presented by the SRS workers. After the Respondent was informed that the child was suicidal, the Respondent stated that he hoped that the child would commit suicide because everyone would be better off. The Respondent also told the social workers that they could bring the child to his office and he would show the child how to commit suicide.

"34. In his response to the initial complaint, the Respondent defended his statement to the SRS workers by stating, 'I do not have a great deal of respect for

[SRS workers] and take advantage of their stupidity as often as possible.' The Respondent reiterated his position at the hearing on this matter.

### "Public Corporal Punishment Comments

"35. The Respondent has taken a public stance in favor of corporal punishment of children. In furtherance of his position, the Respondent maintains a large wooden paddle painted red and emblazoned with the letters 'Board of Education' in his office and has made arrangements for parents to bring their children to the courthouse after business hours, for the administration of public paddlings. He has done this in lieu of bringing formal juvenile proceedings or as an adjunct to such proceedings. The paddlings have been witnessed by the Respondent, juvenile intake workers, and law enforcement officers.

"36. The Respondent's personal opinion regarding paddling children found its way into the newspapers local to the Bourbon County area. The Respondent is quick to point out that the local SRS office is of the opinion that paddling children with a wooden paddle is child abuse. The Respondent, on the other hand, is of the opinion that such paddlings are not child abuse. His justification for having the paddlings administered in the county courthouse in the presence of public officials is to avoid the threat of SRS accusing the parents of the children of child abuse.

### "Weeter Case

"37. On August 30, 1999, John Weeter was charged with two counts of conspiracy to commit murder in the first degree, case number 99CR432. Thereafter, on September 7, 1999, the Respondent amended the charges to include four counts of conspiracy to commit murder in the first degree. Then, on September 28, 1999, the Respondent filed a Second Amended Complaint, and charged Mr. Weeter with one count of attempted murder in the first degree and one count of conspiracy to commit murder in the first degree. Mr. Weeter was represented by Daniel D. Creitz.

"38. The case proceeded to preliminary hearing on September 23, 1999, and October 15, 1999. At the conclusion of the hearing, the court bound Mr. Weeter over on the charges of conspiracy to commit first degree murder and attempted aggravated assault (a lesser included offense of attempted murder in the first degree). The court found that there was insufficient evidence to support a finding of probable cause on the charge of attempted murder in the first degree.

"39. At the conclusion of the preliminary hearing, as the judge was leaving the courtroom, Mr. Creitz approached the Respondent to request a copy of an audiotape material to the case. Ignoring the request, the Respondent told Mr. Creitz to 'fuck off.' Additionally, the Respondent threatened Mr. Creitz, stating he did not want to be 'fucking messing' with the Respondent. The expletives used by the Respondent were heard by the Honorable Patricia Miklos, Judge *Pro Tem*, court services officers, Mr. Weeter, Mr. Weeter's mother, Mr. Gentry (counsel for a co-defendant), and the court reporter, Darcie Cruz. The Respondent, in a fit of pique, vowed to refile the case.

"40. Within a few hours of the conclusion of the preliminary hearing on October 15, 1999, and without the benefit of any new evidence regarding the case, the Respondent refiled the same charge of attempted murder in the first degree, case number 99CR485.

"41. The Respondent subsequently dismissed case number 99CR485 on January 24, 2000. The Respondent explains that the case was dismissed because he failed to subpoena witnesses necessary to establish the charges. However, a week before the case was dismissed, counsel for Mr. Weeter filed a motion to dismiss. Additionally, the preliminary hearing was scheduled before the same judge who had heard it the first time and had refused to find probable cause to bind the defendant over for trial.

"42. At the hearing on his matter, the Respondent justified his actions of refiling the attempted murder in the first degree charge on the theory that, because the facts that gave rise to the conspiracy to commit murder in the first degree charge occurred on one date and the facts that gave rise to the attempted murder in the first degree charge on another, refiling the same charges without new evidence was appropriate.

### "CONCLUSIONS OF LAW

"Based upon the above findings of fact, the Hearing Panel makes the following conclusions of law:

"1. *Gray Case.* Regarding the Gray case, the Respondent stipulated that he violated KRPC 1.1, KRPC 3.4(e), KRPC 8.4(a), KRPC 8.4(d), and KRPC 8.4(g). The Hearing Panel accepts the Respondent's stipulation, and concludes that the Respondent violated KRPC 1.1, KRPC 3.4(e), KRPC 8.4(a), KRPC 8.4(d), and KRPC 8.4(g) during the trial of the Gray case.

a. Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' *Id.* In the Gray case, the Respondent failed to competently represent the state of Kansas when he commented on facts not in evidence, when he made comments as though he were testifying in the case, and when he made other improper comments during closing argument.

b. KRPC 3.4(e) provides as follows:

'A lawyer shall not . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused.'

In this case, the Respondent violated this rule by (1) alluding to a matter that was not supported by admissible evidence, (2) asserting personal knowledge of facts in issue, and (3) stating a personal opinion as to the guilt of the accused. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 3.4(e).

c. The Respondent also violated KRPC 8.4. Specifically, the Hearing Panel concludes that the Respondent violated KRPC 8.4(a), KRPC 8.4(d), and KRPC 8.4(g). The Respondent violated KRPC 8.4(a) by violating KRPC 1.1 and KRPC 3.4(e).

d. The Respondent's misconduct during the Gray trial resulted in a reversal and a new trial. Certainly when prosecutorial misconduct rises to the level of reversible error, justice has been prejudiced. As a result, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).

e. Interjecting his personal testimony that Mr. Gray had syringe marks on his arms the day he was arrested, giving his personal belief regarding Mr. Gray's guilt, commenting that he found drug money in other irrelevant cases, offering evidence from the preliminary hearing regarding Mr. Gray's guilt even though the evidence had not been admitted into evidence, and implying that Mr. Gray was infected with HIV, adversely reflects on the Respondent's ability to practice law. Indeed, the explanations offered by the Respondent during the hearing on this matter do nothing to inspire the Hearing Panel to conclude that the Respondent appreciates the full impact that his conduct had on the administration of justice. Therefore, the Hearing Panel concludes that the Respondent violated KRPC 8.4(g).

f. The Respondent was also charged with violating KRPC 3.3, KRPC 3.4(c), and KRPC 3.8. The Hearing Panel concludes that clear and convincing evidence does not support a finding that the Respondent violated KRPC 3.3, KRPC 3.4(c), and KRPC 3.8. Accordingly, those allegations of the Formal Complaint are dismissed.

"2. *Manufactured Evidence Case*. With regard to the misuse of the Respondent's handkerchief, the Deputy Disciplinary Administrator alleged that the Respondent violated KRPC 8.4(a) when he attempted to violate KRPC 3.3 and KRPC 8.4(c). In addition to the violations alleged in the Formal Complaint, the Hearing Panel has considered the applicability of KRPC 3.4(b).

a. It is appropriate to consider violations not included in the Formal Complaint under certain circumstances. The law in this regard was thoroughly examined in *State v. Caenen*, 235 Kan. 451, 681 P.2d 639 (1984), as follows:

'Supreme Court Rule 211(b) (232 Kan. clxvi), requires the formal complaint in a disciplinary proceeding to be sufficiently clear and specific to inform the respondent of the alleged misconduct.

'The seminal decision regarding the applicability of the due process clause to lawyer disciplinary proceedings is found in *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117, *reh. denied* 391 U.S. 961, 88 S.Ct. 1833, 20 L.Ed.2d 874 (1968). There the United States Supreme Court held that a lawyer charged with misconduct in lawyer disciplinary proceedings is entitled to procedural due process, and that due process includes fair notice of the charges sufficient to inform and provide a meaningful opportunity for explanation and defense.

'Decisions subsequent to *Ruffalo* have refined the concept of due process as it applies to lawyer disciplinary hearings, and suggest that the notice to be provided

be more in the nature of that provided in civil cases. The weight of authority appears to be that, unlike due process provided in criminal actions, there are no stringent or technical requirements in setting forth allegations or descriptions of alleged offenses. . . . Due process requires only that the charges must be sufficiently clear and specific to inform the attorney of the misconduct charged, but the state is not required to plead specific rules, since it is the factual allegations against which the attorney must defend. . . . However, if specific rules are pled, the state is thereafter limited to such specific offenses. . . .

'Subsequent to the *Ruffalo* decision, the due process requirements in lawyer disciplinary proceedings have been given exhaustive treatment by this court. In *State v. Turner*, 217 Kan. 574, 538 P.2d 966 (1975), 87 A.L.R.3d 337, the court summarized prior Kansas and federal precedent on the question, including *Ruffalo*, and held in accordance with established precedent that the state need not set forth in its complaint the specific disciplinary rules allegedly violated . . ., nor is it required to plead specific allegations of misconduct. . . . What is required was simply stated therein:

"We must conclude that where the facts in connection with the charge are clearly set out in the complaint a respondent is put on notice as to what ethical violations may arise therefrom. . . .

. . . .

"It is not incumbent on the board to notify the respondent of charges of specific acts of misconduct as long as proper notice is given of the basic factual situation out of which the charges might result.' "

235 Kan. at 458-59 (citations omitted). Thus, only when the Formal Complaint alleges facts that would support findings of violations of the amendments, will considering additional violations be allowed. In this case, the Formal Complaint contains sufficient facts to support a finding that the Respondent attempted to violate KRPC 3.4(b). Thus, in the opinion of the Hearing Panel, the additional violation of KRPC 3.4(b) should appropriately be considered.

c. In this case, the Respondent attempted to falsify evidence, as prohibited by KRPC 3.4(b). Although the Respondent defends his statements and actions regarding the handkerchief as an appropriate use of 'demonstrative evidence,' the Hearing Panel notes that he brought this material to a plea and sentencing hearing. The evidence supporting the charges of the amended complaint to which the defendant was expected to plead guilty have little to do with this bit of manufactured evidence. If the Respondent is sincere in his belief that the use of his personal handkerchief at this proceeding is an appropriate use of 'demonstrative evidence' then his fitness to practice law is seriously called into question. A remedial course in the rules of evidence would appear in order. The Respondent also testified that the reason he placed his own handkerchief into the paper sack was to embarrass Mr. Scott and to lead Mr. Scott to believe that he had the original handkerchief in court in case Mr. Scott failed to enter his plea pursuant to the plea agreement. This latter explanation for the Respondent's behavior is far more

credible given the Respondent's demeanor throughout the proceedings. The Respondent testified:

'My intent was to embarrass the defendant because his wife was there and he was denying it in front of his wife. The young pregnant girl was right there. He had to—that was part of the punishment order that he had to apologize to the girl. His wife was there. So I didn't really need to bring the bag in there.'

Because the Respondent intended for Mr. Scott to believe that the Respondent's handkerchief was actually the handkerchief that had been collected at the scene of the crime, the Respondent attempted to falsify evidence. Sgt. Hawpe recognized clearly what the Respondent intended to do and refused to participate in the deception. The chief law enforcement officer of the county should have the same ethical compass.

d. The Respondent engaged in 'conduct involving dishonesty, fraud, deceit or misrepresentation,' when he placed his handkerchief into the paper sack and acted as though that was the handkerchief collected as evidence in the case. KRPC 8.4(c). Through his actions, rather than his words, the Respondent purported that what he had before him was the evidence in the case. Although following the plea and sentencing hearing, the Respondent explained to counsel for Mr. Scott that the Respondent's personal handkerchief was in the paper sack, there was no evidence presented as to whether Mr. Scott or the judge were [led] to believe that the sack contained evidence. However, the Respondent's intent is clear from the record. The Respondent testified that he wanted to ensure that if Mr. Scott decided to change his mind, and not enter his plea pursuant to the plea agreement, that Mr. Scott would believe that the Respondent had the evidence of the crime. Respondent testified:

'But I could have used it. I mean, if the lieutenant had just carried it in—well, even if as long as it's there, I can still use it with the lieutenant if the man at the last second had changed his mind and not wanted to plead.'

The Respondent misled Mr. Scott to ensure a guilty plea. The Respondent was engaging in 'dishonesty, fraud, deceit or misrepresentation,' in violation of KRPC 8.4(c). Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

e. KRPC 8.4(a) provides that it is professional misconduct to: '[v]iolate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another.' Because the Respondent attempted to violate KRPC 3.4(b), and because the Respondent did violate KRPC 8.4(c), the Hearing Panel concludes that the Respondent violated KRPC 8.4(a).

"f. The Deputy Disciplinary Administrator alleged in the Formal Complaint that the Respondent also attempted to violate KRPC 3.3. The evidence does not support a finding that the Respondent attempted to violate KRPC 3.3. Therefore, the allegation in the Formal Complaint that the Respondent attempted to violate KRPC 3.3, is dismissed.

"3. *Briggs Case.* In the Briggs case, the Respondent was charged with having violated KRPC 1.1, KRPC 3.7, KRPC 4.2, KRPC 8.4(a), KRPC 8.4(d), KRPC 8.4(e), and KRPC 8.4(g).

a. KRPC 8.4 provides, in pertinent part, as follows:

'It is professional misconduct for a lawyer to:

. . . .

'(d) engage in conduct that is prejudicial to the administration of justice;

'(e) state or imply an ability to influence improperly a government agency or official;

. . . .

'(g) engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.

In this regard, the Respondent violated KRPC 8.4(d), KRPC [8.4](e), and KRPC 8.4(g).

b. The Respondent engaged in conduct that was 'prejudicial to the administration of justice,' when he contacted Mr. Briggs without the presence or permission of Mr. Gentry. The first contact that the Respondent had with Mr. Briggs was admitted into evidence at the preliminary hearing. Subsequent to the second contact that the Respondent had with Mr. Briggs, Mr. Gentry had to prepare and file a motion to suppress the statements made to the Respondent. As a result, the administration of justice was prejudiced. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).

c. By stating to Mr. Briggs that the plea offer was still open, the Respondent (not acting in his official capacity as County Attorney) stated an ability to influence a government official, namely Mr. Meara, the special prosecutor. Because the Respondent acted as though he had the authority of Mr. Meara to settle a pending criminal case, the Hearing Panel concludes that the Respondent violated KRPC 8.4(e).

d. Contacting a criminal defendant, without the presence or permission of defense counsel reflects adversely on the Respondent's ability to practice law. Respondent explained to the Panel that he did not contact defense counsel because of an ongoing problem with the particular attorney appointed to represent the defendant. This explanation seem[ed] counter intuitive to the Hearing Panel. If the Respondent had problems with defense counsel then *ex parte* communications with the client of that attorney would only exacerbate the conflict between the Respondent and defense counsel. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.4(g).

e. The Deputy Disciplinary Administrator alleged that the Respondent violated KRPC 4.2. KRPC 4.2 provides:

'*In representing a client*, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. [Emphasis added.]'

In this case, because the Respondent was not 'representing a client,' the Respondent did not violate KRPC 4.2. As a result, the allegation that the Respondent violated KRPC 4.2 is dismissed. *See also State v. Sperry*, 267 Kan. 287, 978 P.2d 933 (1999). The Hearing Panel notes that the Respondent was looking after his own interests rather than the interests of the state of Kansas, and attempted to use the color of his office as county attorney to secure the return of his personal property. While he appears to have recognized the logistical problems of acting as trial counsel and witness in the same action, the ethical considerations of his situation appear to have completely escaped the Respondent. His conduct throughout the *ex parte* contacts in the Briggs case indicates a clear intent to use the power of his office for his personal benefit or to, take advantage of a lay person in obtaining admissions against interest. In light of the suppression of the Briggs statements in the criminal case, the Respondent's conduct was ethically questionable and strategically ineffective.

f. The Hearing Panel also concludes that clear and convincing evidence was not presented to support findings that the Respondent violated KRPC 1.1, KRPC 3.7, and KRPC 8.4(a). Accordingly, those allegations contained in the Formal Complaint are hereby dismissed.

"4. *Gardner Case*. The Deputy Disciplinary Administrator alleged in the Formal Complaint, regarding the Gardner case, that the Respondent violated KRPC 3.8(c), KRPC 4.3, and KRPC 8.4(d).

a. KRPC 3.8(c) provides that a 'prosecutor in a criminal case shall . . . not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing.' In this case, the Respondent contacted an unrepresented, charged defendant and asked him to waive an important pretrial right—the right to remain silent. Based upon these facts, the Hearing Panel concludes that the Respondent violated KRPC 3.8(c).

b. Contacting an unrepresented, charged defendant one hour prior to the time the defendant would have counsel appointed to represent him, also prejudiced justice. As a result of the contact, Mr. Gardner's counsel found it necessary to file a motion to suppress. The statements made by Mr. Gardner were suppressed. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).

c. The Deputy Disciplinary Administrator also alleged that the Respondent violated KRPC 4.3. KRPC 4.3 provides:

'In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.'

The Deputy Disciplinary Administrator failed to present clear and convincing evidence that the Respondent implied that he was disinterested or that Gardner misunderstood the Respondent's role in the matter. As such, the Hearing Panel hereby dismisses the allegation that the Respondent violated KRPC 4.3.

"5. *Reyes Case.*

a. Requiring a criminal defendant to post a bond serves two purposes. First, the bond must be 'sufficient to assure the appearance' of the defendant, and second, the bond must be sufficient 'to assure the public safety.' K.S.A. 22-2802(1). Additionally, the magistrate may order that conditions be placed on a bond. The court may consider the following factors when determining which conditions to place on a bond:

'the nature and circumstances of the crime charged; the weight of the evidence against the defendant; the defendant's family ties, employment, financial resources, character, mental condition, length of residence in the community, record of convictions, record of appearance or failure to appear at court proceedings or of flight to avoid prosecution; the likelihood or propensity of the defendant to commit crimes while on release, including whether the defendant will be likely to threaten, harass or cause injury to the victim of the crime or any witnesses thereto; and whether the defendant is on probation or parole from a previous offense at the time of the alleged commission of the subsequent offense.' K.S.A. 22-2802(5).

In the Reyes case, the Respondent recommended to the court that the bond not be lowered because the defendant was Hispanic, could easily flee to Mexico, and once there, blend in with the population. The Respondent testified that:

'And the reasoning that I used those arguments that here was a person who could speak Spanish, he could disappear into the Spanish speaking country of Mexico. We don't have a good relationship. I mean, the media says we don't have a good relationship as far as getting people out to extradite for crimes committed in our country.'

The Respondent argues that this comment was appropriate because it was evidence that Mr. Reyes would absent himself from the court proceedings. However, the Respondent had no evidence that Mr. Reyes was a flight risk. The only evidence that the Respondent offered was based on Mr. Reyes' ethnicity.

b. Arguing that a criminal defendant's ethnicity is evidence of flight is prejudicial to the administration of justice. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).

c. Additionally, the comments made by the Respondent and his continued inability to see any error in those statements reflects adversely on his ability to practice law. Indeed the Respondent rationalized his position by informing the Panel that if the defendant were of Asian descent he would have argued for a higher bond on the basis that the defendant could flee to 'Chinatown' and never be found. These statements shock the Hearing Panel. They do not ameliorate the inference of racism; instead the Respondent's justification demonstrates that he holds an equally prejudicial view towards all defendants of a differing ethnic background. No public official entrusted with the privilege of representing the great 'free state' of Kansas should ever use the ethnicity of a criminal defendant as the basis of a legal argument. To do so undermines the very fundamental tenants upon which this state was founded. The Respondent needs to be reminded that

the symbol of justice traditionally wears a blindfold and that the first duty of a prosecuting attorney is to see that justice is done. The Hearing Panel thus concludes that the Respondent violated KRPC 8.4(g).

"6. *Slavery Comments*.

a. Positioning himself a few feet from an African American teenage girl and shouting, 'Do you think slavery is over? Damn it young lady answer me, do you think slavery is over? I'm here to tell you it's not, your mother owns you until you are 18,' adversely reflects on the Respondent's fitness to practice law. To justify his view the Respondent informed the Hearing Panel that according to his interpretation of the case law the U. S. Supreme Court holds the view that children are 'not mere chattel' but are 'owned' by their parents. The authority cited by the Respondent does not support this view. During the hearing the Respondent elaborated his opinion during the following exchange:

'MR. RAMIREZ: I've got to ask, did it ever occur to you that making a reference to slavery to an African American might be offensive?

'MR. SWARTS: Well, his parents—the girl's parents were right there. They didn't seem to take offense. And I used that same language with a white kid, a brown kid, a rich kid—

'MR. RAMIREZ: So it never occurred to you that that might be offensive?

'MR. SWARTS: No.

'MR. RAMIREZ: And as a public official, a county attorney, the reference to slavery—making a reference to slavery to an African American teenager, you did not view that as being offensive?

'MR. SWARTS: I've used the same comment regardless of race.

'MR. RAMIREZ: That answers my question.

Accordingly, the Hearing Panel concludes that the Respondent violat[ed] KRPC 8.4(g).

b. Clear and convincing evidence was not presented to establish that this also amounts to a violation of KRPC 8.4(d). As such, the allegation that the Respondent violated KRPC 8.4(d) in this regard is dismissed.

"7. *Advice to Chain Child to Bed*.

a. Advising a father to chain his son to the bed, adversely reflects on the Respondent's fitness to practice law. The Respondent presented his testimony as to the advice that he gave a tearful parent of a disturbed child:

'Cuff him to his bed so you can get some sleep. You shouldn't have to lose your job.' I said, 'Go to Walmart. Buy a chain and a padlock. Keep the key with you. The house starts to burn, run in, get him out, but he won't crawl out the window if he's got the bed frame attached. The mattress can go out, the pillows can go out, but the frame won't come out the window. So he won't be out at 3:00 in the morning breaking into people's stuff or doing anything else.'

The child's parents apparently took the Respondent's advice, which ultimately [led] to the child being placed in SRS custody. The Respondent presented evidence that the child was placed in "Parkview." The records of the case indicate

that tragically the child died while in the custody of the state of Kansas. The Respondent's observation to the Panel was:

'So, I may have given him some tough advice, folks, but, Your Honors, *on my watch that child did not die*. In state custody we lost another kid. And I just— I don't think I did wrong.' [Emphasis added.]

The Hearing Panel concludes that the Respondent 'did wrong' and violated KRPC 8.4(g), by providing such advice.

b. The Deputy Disciplinary Administrator alleged that this conduct also violated KRPC 8.4(d). Because the Hearing Panel finds that clear and convincing evidence was not presented to support this conclusion, the allegation that the Respondent violated KRPC 8.4(d) is accordingly dismissed.

"8. *Suicide Comments.*

a. The Respondent's flippant comments and attitude exhibited to the SRS workers adversely reflects on his fitness to practice law. Therefore, the Hearing Panel concludes that the Respondent violated KRPC 8.4(g).

b. The Hearing Panel concludes that the record is lacking clear and convincing evidence that the comments prejudiced the administration of justice. Therefore, the allegation that the Respondent violated KRPC 8.4(d) in this regard is dismissed.

"9. *Public Corporal Punishment Comments.*

a. The Respondent's personal opinion regarding paddling children found its way into the newspapers local to the Bourbon County area. Certainly, attorneys have the right to express their personal opinions on a variety of subjects. However, the Respondent has not confined his comments to his personal life. The Respondent is quick to point out that the local SRS office is of the opinion that paddling is child abuse. The Respondent, on the other hand, is of the opinion that paddling is not child abuse. By condoning and encouraging the public paddling of minor children in his office, by advertising that the paddle is available for use by parents at the courthouse, by supervising the paddlings, by providing the instrument of the paddlings as a ornament on the office wall of the county attorney, and by publicly condemning the opinion of SRS under color of his office as county prosecutor, the Respondent turned a personal belief into a public practice.

b. The Respondent's comments regarding public corporal punishment and the maintenance of the 'Board of Education' in his office has created an atmosphere in Bourbon County, where the parents do not know whether paddling their children is allowed or prohibited by the local authorities. This uncertainty rises to the level of being prejudicial to the administration of justice. Additionally, the comments made by the Respondent adversely reflect on his fitness to practice law. As a result, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d) and 8.4(g).

c. KRPC 3.5(d) provides that a lawyer shall not 'engage in undignified or discourteous conduct degrading to a tribunal.' In this regard, clear and convincing evidence was not presented that the public corporal punishment comments and activity amount to 'undignified or discourteous conduct that is degrading to a

tribunal.' Therefore, the Hearing Panel dismisses the allegation that the Respondent violated KRPC 3.5(d) in relation to the public corporal punishment comments and activity.

"10. *Weeter Case.* In the Formal Complaint, the Deputy Disciplinary Administrator alleged that the Respondent violated KRPC 3.5(d), KRPC 3.8(a), KRPC 8.4(d), and KRPC 8.4(g). As detailed below, the Hearing Panel concludes that the Respondent violated each of the charged offenses in this case. Additionally, the Hearing Panel concludes that the Respondent violated KRPC 1.1 in handling the Weeter case.

a. The Deputy Disciplinary Administrator did not allege that the Respondent violated KRPC 1.1 in the Formal Complaint. However, because facts, sufficient to establish a violation of KRPC 1.1, were included in the Formal Complaint, it is appropriate to consider the additional violation of KRPC 1.1.

b. Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The Respondent does not understand that because the court found that the attempted murder in the first degree charge lacked probable cause, refiling was inappropriate unless and until he had new or additional evidence to bring before the court. Therefore, the Respondent failed to competently represent the state of Kansas when he refiled the charge of attempted murder in the first degree, without the benefit of new or additional evidence.

c. 'A lawyer shall not . . . engage in undignified or discourteous conduct degrading to a tribunal.' KRPC 3.5(d). In this case, the use of expletives to Mr. Creitz in the presence of Judge Miklos, constitutes undignified and discourteous conduct. The Hearing Panel concludes that the Respondent violated KRPC 3.5(d).

d. Prosecutors are prohibited from 'prosecuting a charge that the prosecutor knows is not supported by probable cause.' KRPC 3.8(a). In this case, there was a judicial determination that the attempted murder in the first degree charge lodged against Mr. Weeter lacked probable cause. When the Respondent refiled that charge without the benefit of any new or additional evidence, the Respondent violated KRPC 3.8(a). Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 3.8(a).

e. Refiling the attempted murder in the first degree charge against Mr. Weeter, was prejudicial to the administration of justice. As a direct result of this misconduct, Mr. Weeter's release from jail was delayed, Mr. Creitz had to contact a judge to discuss the bond implications, and Mr. Creitz had to prepare and file a motion to dismiss. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).

f. Using the expletives and inappropriately refiling the attempted murder in the first degree charge adversely reflects on the Respondent's fitness to practice law. The Hearing Panel therefore concludes that the Respondent violated KRPC 8.4(g) in the Weeter case.

## "RECOMMENDATION

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* In this case, the Respondent violated his duty to the public to maintain trust.

"*Mental State.* The Respondent knowingly violated his duty to maintain public trust.

"*Injury.* The legal process suffered in almost every instance of misconduct. Cases were delayed, counsel for the defendants had to prepare additional motions and memoranda, and individuals suffered personal difficulties based upon the Respondent's misconduct.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. Although the Deputy Disciplinary Administration made no argument for aggravating factors, the Hearing Panel finds the following aggravating factors present:

"Pattern of Misconduct. The Respondent was found to have engaged in misconduct in ten separate factual settings. As a result, the Respondent engaged in a pattern of misconduct.

"Multiple Offenses. The Hearing Panel has concluded that the Respondent violated KRPC 1.1, KRPC 3.4(b), KRPC 3.4(e), KRPC 3.5(d), KRPC 3.8(a), KRPC 3.8(c), KRPC 8.4(a), KRPC 8.4(c), KRPC 8.4(d), KRPC 8.4(e), and KRPC 8.4(g). Certainly, the Respondent engaged in multiple offenses.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"Absence of Prior Disciplinary Record. The Respondent has no prior disciplinary record.

"Present and Past Attitude of Cooperation. The Respondent has fully cooperated with the disciplinary authorities in this case.

"Inexperience in the Practice of Law. While the Respondent has practiced law since 1984, the misconduct in this case started shortly after the Respondent took the office of the Bourbon County Attorney. Accordingly, the Respondent was inexperienced in the practice of law as a County Attorney.

"Previous Good Character and Reputation. The Respondent's Exhibit Z contains a number of letters from attorneys, court personnel, law enforcement officers, crime victims, and community members. Collectively, the letters confirm that the Respondent has an aggressive and controversial approach to the practice

of law. Many of the letters indicate that the Respondent cares very deeply for his community.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered Standard 5.22. That standard provides, in pertinent part:

'Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process.'

"The Respondent presented a plan of probation. Rule E.8 of the Internal Operating Rules of the Kansas Board for Discipline of Attorneys addresses when probation is appropriate:

'The recommendation that a responding lawyer be placed on probation is appropriate only in exceptional cases with persuasive mitigating factors. Probation should never be recommended unless a substantial and detailed plan of probation containing adequate safeguards to protect the public and to ensure respondent's full compliance with the disciplinary rules and the orders of the court has been timely initiated and presented to the Hearing Panel by the respondent. *In re Jantz*, 243 Kan. 770, 763 P.2d 626 (1988). Special findings as to the appropriateness of probation and the specific conditions of probation should be included in the Hearing Report.'

This case is not an exceptional case, and persuasive mitigating factors are not present. Additionally, the Respondent failed to provide a 'substantial and detailed plan of probation' that contains 'adequate safeguards to protect the public and to ensure respondent's full compliance with the disciplinary rules and the orders of the court.' As such, the Hearing Panel recommends that the Respondent's request for probation be denied.

"The Hearing Panel unanimously recommends that Respondent be suspended from the practice of law in the state of Kansas, for a period of one year.

"The Hearing Panel is quite concerned with the Respondent's reaction to the power that he wields in his position as Bourbon County Attorney. The cold record of the hearing in this case cannot do complete justice to the attitude and demeanor that the Respondent exhibited throughout the hearing. The Respondent apparently views himself as the sole guardian of justice and right in Bourbon County, Kansas. He views himself as better equipped than SRS in addressing the needs of juveniles. His self-image is surpassed only by an amazing lack of self-judgment. He is apparently a populist figure in his community and has attracted a loyal group of followers. This no doubt has contributed to his attitude and addiction to the power of his office. In this regard he is not different than many other elected officials. However, in the opinion of the Hearing Panel, Respondent lacks the characteristics needed to effectively hold the office of County Attorney and until he understands his shortcoming he should not exercise the privilege of practicing law in the state of Kansas. It is hoped that the Respondent will have the time for introspection during a suspension of his practice that may lead to a better self-awareness of the deficiencies that [led] to the filing of these complaints.

"The Hearing Panel recommends that the Respondent be required to undergo a hearing pursuant to [Rule] 219 prior to reinstatement to the practice of law in the State of Kansas. At the time the Respondent applies for reinstatement, it is recommended that the Hearing Panel consider whether the Respondent should be allowed to hold the office of County Attorney. In making this determination, the Hearing Panel should review whether the Respondent fully understands his wrongdoing in this case, and also understands how to effectively and appropriately carry out the duties of County Attorney.

"Costs are assessed against the Respondent in an amount to be certified by the office of the Disciplinary Administrator."

*Respondent's exceptions and brief on appeal.*

Pursuant to Supreme Court Rule 212(c) (2000 Kan. Ct. R. Annot. 254), respondent filed exceptions to the final hearing report relating to findings allegedly incorrectly made or which it is claimed should have been made. Respondent further contends the report exceeds the charge of Rule 212(f) to make findings and recommendations and has editorialized its view of "political correctness" which is not a part of its function under Supreme Court Rule 211 (2000 Kan. Ct. R. Annot 250).

We will consider respondent's stated exceptions and arguments in his brief as relates to the separate instances. Respondent also contends that a lesser discipline should be imposed and has submitted an amended probation plan whose consideration is not opposed by the office of the Disciplinary Administrator, but it contends that exceptional circumstances do not exist in this case to justify its imposition and asks the recommendation of the hearing panel be followed.

<u>Gray Case—Count I</u>

Respondent admits to violations of KRPC 1.1, 3.4(e), 8.4(d) and (g), but does argue that he should not be disciplined for cautioning jurors not to touch syringes admitted into evidence, and he was new in the county attorney's role when the case was tried and his experience should be a mitigating factor.

We need not discuss *State v. Gray*, in detail which is reported in 25 Kan. App. 2d 83, 958 P.2d 37 (1998), except to note that the ethical violations relating thereto were recognized in an appellate decision requiring a new trial. Respondent's conduct, while falling

short of ethical standards and reflective of his failure to compre-hend the obligation and delicate balance a prosecutor must follow under KRPC 3.8, was violative of the rules as admitted. Viewed individually as an isolated incident this would be less serious, but as a part of a pattern of continued abuses, these violations may not be minimized as respondent suggest.

## Awbrey Hawpe Case—Count II

Respondent objects to the hearing panel designating this count as the "Manufactured Evidence Case" as an illustration of the non-objective role it took in this matter. He contends his own hand-kerchief in the paper sack was never marked as an exhibit, repre-sented improperly, and could have been used as "demonstrative evidence."

This is an example of respondent's bad judgment as he finally, when appearing before our court and after attempting to justify his actions, admitted he had an obligation to disclose essential facts of the case, which he failed to do. His suggestion that the paper sack was there to potentially embarrass the defendant shows a totally deficient understanding of his obligations as a prosecutor. We hold that the panel properly found violations of KRPC 8.4(a) and 8.4(c) but there was no violation of KRPC 3.3.

## Briggs Case—Count III

Although respondent was the victim of Mark Briggs' thievery, he failed to understand the difference between being a county attorney and a victim. He should also have realized that speaking with Briggs (even when Briggs contacted him) after Briggs was represented by counsel was a clear ethical violation.

Respondent admits that KRPC 8.4(e) was violated because he implied he could influence the special prosecutor. This was a direct violation. Respondent's actions in allowing contact with Briggs on multiple instances and obtaining incriminating statements (even though legally suppressed) are violations of KRPC 8.4(d), which states it is professional misconduct to "engage in conduct that is prejudicial to the administration of justice" and KRPC 8.4(g), which states a lawyer must not "engage in any other conduct that

adversely reflects on the lawyer's fitness to practice law. Respondent's arguments to the contrary are without merit.

### Gardner Case—Count IV

Respondent suggests that because Gardner had been previously advised of his rights and made statements, his question about what the phrase "or else" meant was actually exculpatory and not incriminating. This does not justify contacting the unrepresented Mr. Gardner shortly before counsel was appointed and shows bad judgment since any statement, even if properly received, would require respondent to become a witness and not a prosecutor. Any harm was cured by a motion to suppress which should never had to be filed but we hold the hearing panel properly found violations of KRPC 3.8(c) and KRPC 8.4(d).

### Reyes/Juvenile Case—Count V

We do not take umbrage to the extent the hearing panel did to respondent's remark that one of the reasons a bond should not be reduced was because the defendant was Hispanic and could flee to a Spanish speaking county which might make extradition difficult. We agree that ethnicity should not be evidence of flight risk but respondent's response to the hearing panel contains additional reasons to justify opposing bond reduction. Respondent said:

"This was a serious charge involving a child victim . . . . the man . . . had no known ties to the community or the State . . . he had a long criminal history according to his triple I, with at least two serious person felonies on it. . . . I wanted a high bond, or one high enough that some bondsman would go get him no matter where he went."

The record does not contain clear and convincing evidence that respondent's arguments were based solely on the ethnicity of the defendant, and while we find the tenor of his statements to be ill advised and lacking in the understandable feelings of citizens, we do not find that KRPC 8.4(d) or 8.4(g) were violated based on the statements in the Reyes bond reduction hearing.

We do find respondent's conduct in the three cases relating to the juveniles to be much more troubling and shows a lack of the civility that is necessary for one with public trust and responsibility.

### Slavery comments

To position oneself in front of and to shout at an African-American teenage girl concerning her being a slave (if only to her mother) is clearly an offensive remark that shows insensivity to the right of individuals. The difficult question is, when does bad taste and political incorrectness becomes violative of an attorney's obligation under KRPC 8.4(g) to not "engage in other conduct that adversely reflects on the lawyer's fitness to practice law." While there are numerous violations in this case and we need not embark on analyzing whether free speech rights should be an issue here, we uphold the hearing panel's finding of a KRPC 8.4(g) violation.

### Advice to chain child to bed

This is another "off the wall" comment of an elected public official that has no place in the effective and orderly administration of justice. To advise a father to chain a child to a bed so he could get some sleep (notwithstanding the turmoil the family was in over the problems the child was causing and the inability of juvenile authorities to place the child in a secure facility) was flippant and totally inappropriate. The fact the father did so and SRS custody resulted in a tragedy does not make what respondent calls "tough advice" justifiable. We agree with the hearing panel's conclusion that KRPC 8.4(g) was violated.

### Suicide comments

Respondent cannot justify his comments that when informed that a 14-year old child was suicidal, he stated that he hoped the child would commit suicide because everybody would be better off. While he now says his comment was never intended to be taken seriously, it is unpardonable to tell social workers that they should bring the child to his office and he would show the child how to commit suicide. These comments are beyond the pale of decency and clearly justify the hearing panel's finding of KRPC 8.4(g) violation.

An additional sign of the respondent's arrogance and unfitness for public office was his defense of his statements to SRS officials that "I do not have a great deal of respect for [them] and take

advantage of their stupidity as often as possible." To reiterate such an nondefensible position at the hearing shows a lack of respect for individuals and views different from one's own which is truly appalling.

## Public Corporal Punishment Comments—Count VI

Respondent contends his public support of paddling for children is not "public" or made in lieu of bringing formal juveniles proceedings. The hearing panel opined and this court agrees that views differ on corporal punishment and respondent has the right to express his personal opinion on the subject. We hold, however, that it is improper to turn one's private beliefs into a public practice as respondent has done. While there appears to be justifiable disagreement as to this practice, the usage of a personal belief does reflect adversely on respondent's fitness to practice law, and we approve the hearing panel's conclusions that KRPC 8.4(d) and 8.4(g) were violated.

## Weeter Case—Count VII

Respondent admits that he should not have used expletives in the courtroom after the conclusion of the Weeter preliminary hearing and should be disciplined for doing so. He also admits that his responses to a reasonable request of defense counsel were undignified and discourteous and a violation of KRPC 3.5(d) (undignified or discourteous conduct degrading to a tribunal).

Respondent does not agree that there was an ethical violation prejudicial to the administration of justice by refiling charges that were dismissed in the preliminary hearing 2 hours earlier. While he attempted to justify it by stating additional evidence would become available, it clearly appears the filing was accomplished in anger. While it was hoped the required new evidence would become available, such was not certain when the filing was made. This is a violation of KRPC 3.8(a) (prosecuting a charge . . . not supported by probable cause).

The use of the "F" word on several occasions in the Weeter matter and the anger shown by the respondent reflects adversely

on his fitness to practice law and specifically to competently and fairly carry out the duties of a prosecutor.

We hold the hearing panel correctly held that violations of KRPC 3.5(d), 3.8(a), 8.4(d), and 8.4(g) were proved by clear and convincing evidence.

## Discipline to be imposed

### Standard of review

We said in *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 (1993), that our standard of review of the recommended sanctions to be imposed is as follows:

"In *State v. Klassen*, 207, 414, 415, 485 P.2d 1295 (1971), we explained that we have a 'duty in a disciplinary proceeding to examine the evidence and determine for ourselves the judgment to entered.' In *State v. Zeigler*, 217 Kan. 748, 755, 538 P.2d 643 (1975), this court stated that, although the report of the disciplinary board 'is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony.' See *In re Farmer*, 242 Kan. 296, 299, 747 P.2d 97 (1987)."

### Recommendations of the parties

We have previously set forth the recommendation of the hearing panel which was a 1-year suspension with a hearing pursuant to Supreme Court Rule 219 (2000 Kan. Ct. R. Annot. 274) prior to reinstatement being granted with emphasis on respondent's fitness to hold a prosecutor's position.

The Disciplinary Administrator argues persuasively that respondent fails to recognize the harm caused to his office and the public by his conduct in what amounts to 10 different incidents of misconduct, and the discipline recommended by the hearing panel is appropriate and should be imposed. The Disciplinary Administrator further suggests that the suggested plan of supervised probation including resignation from the office of county attorney is not based on exceptional and persuasive mitigating factors and would be an inappropriate sanction. The Disciplinary Administrator recommended, like the hearing panel, that respondent be suspended from the practice of law.

The respondent first asks for discipline to be limited to published censure or a short suspension for violations which he admits did take place in the Gray, Briggs, and Weeter cases. He argues these are negligent, not intentional, acts. In his brief he admits to a lack of discretion in his remarks and rare incompetence which he says "lies not from laziness or stupidity but from overzealous and impassioned representation of . . . the state of Kansas."

The respondent argues that other than the violations he admitted, there is not clear and convincing evidence of the violations, or the incidents do not constitute ethical violations. In essence, he tries to characterize his conduct as being politically incorrect, bad humor, and intemperate, but not ethical violations.

If all the violations are found by the court to exist, respondent asks in his amended plan of probation to be allowed to resign as Bourbon County Attorney, but if requested, to serve as an assistant until eligible for Kansas Public Employees Retirement System benefits as of January 1, 2002. He further agrees to retire from the practice of law, and on the next regular renewal date, to elect inactive status. He agrees to be placed under direct supervision of attorney Zachery E. Reynolds who will monitor his probation plan.

## Decision of the court

We recognize the respondent's attempt to compare his conduct with six unrelated attorney disciplinary cases but do not find that helpful in our decision or to respondent's benefit. As we said in *In re Bailey*, 268 Kan. 63, 64-65, 986 P.2d 1077 (1999):

"In *Jones*, we noted that '[c]omparison of past sanctions imposed in disciplinary cases is of little guidance.' 252 Kan. at 239. It is not helpful, therefore, for the respondent to point out past disciplinary actions in the hopes that the disposition for this case will be similar. Each case should be evaluated based on its specific facts and circumstances. In determining the appropriate discipline to be imposed for violating the disciplinary rules, we consider the facts surrounding the violation as well as any aggravating or mitigating circumstances. *State v. Stakes*, 227 Kan. 711, 720, 608 P.2d 997 (1980)."

Attorneys may be guilty of boorish conduct without such actions becoming an ethical violation. We are likewise hesitant to become guardians of what in the current vernacular is deemed to be polit-

ically correct or incorrect conduct. Having said this, we are drawn back to what we said in *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000); "A prosecutor is a servant of the law and a representative of the people of Kansas." When one undertakes the responsibility of prosecution we must view his or her conduct by an enhanced standard. See *United States v. Young*, 470 U.S. 1, 25, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985).

We need not here set forth the KRPC 3.8 statements of the special responsibilities of a prosecutor which are ethical standards that must be adhered to and followed. We do point out that violations have been found of KRPC 8.4 and in our comments to that rule, it is stated:

"Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of attorney."

The hearing panel noted the many letters sent in support of respondent as indicating he cared very deeply for his community but also confirmed his aggressive and controversial approach to the practice of law. These submissions also call attention to respondent's military service which included several tours in Viet Nam and decorations for exemplary service for which he is entitled to be commended. However, continuing to exhibit conduct which might be acceptable in the military while in the public sector and, specifically, in the role of a prosecutor is not to be condoned or tolerated. This may in part explain the respondent's persona, but it makes such actions no less objectionable.

Respondent is entitled to the observation that he had no previous complaints or violations during the period of his private practice of law. All of the complaints before us involve conduct as a public official.

In determining the appropriate discipline, we point out this is not a suit to oust respondent from the public office to which he was appointed in 1994 and subsequently elected in 1996 and re-elected in 2000. The will of an electorate in returning respondent to the office of county attorney must likewise be considered in our imposition of discipline.

The court is in substantial agreement as to the numerous violations and finds there is clear and convincing evidence that respondent has committed the following ethical violations in the respective counts:

| | |
|---|---|
| Gray, Count I | Rule 1.1, 3.4(e), 8.4(a), (d) and (g) |
| Hawpe, Count II | Rule 8.4(a) and (c) |
| Briggs, Count III | Rule 8.4(d), (e), and (g) |
| Gardener, Count IV | Rule 3.8(c) and 8.4(d) |
| Reyes, Juvenile, Count V | Rule 8.4(g) |
| Public Punishment, Count VI | Rule 8.4(d) and (g) |
| Weeter, Count VII | Rule 3.5(d), 3.8(a), 8.4(d) and (g) |

While a minority of the court would impose lesser discipline, the majority of the court finds that the public will be sufficiently served if respondent is allowed to serve as Bourbon County Attorney until January 1, 2002, when he stated in his amended plan of probation he will be vested for purposes of his participation in the Kansas Public Retirement System (KPERS) and eligible to receive benefits thereunder. Although he offered in his amended probation plan to resign immediately upon acceptance of his probation plan, we accept his offer but make it effective January 1, 2002. We also accept respondent's intention set forth in his amended probation plan to retire from the practice of law when he becomes eligible for KPERS benefits (January 1, 2002), and on the next regular renewal date (July 1, 2002), to elect inactive status with respect to his license to practice law. During the period until respondent's resignation becomes effective, he is expected to ethically perform his duties as Bourbon County Attorney.

IT IS THEREFORE ORDERED that the findings of fact and conclusions of law of the hearing panel are approved subject to the limitations of this opinion, and clear and convincing evidence support the findings that respondent violated KRPC Rule 1.1, 3.4(e), 3.5(d), 3.8(a) and (c), and 8.4(a), (c), (d), (e), and (g).

IT IS FURTHER ORDERED that the imposition of discipline against John Lloyd Swarts, III, be suspended and that he be placed on supervised probation under the terms of this order.

IT IS FURTHER ORDERED:

(1) Respondent is allowed to serve as Bourbon County Attorney until January 1, 2002, until he is vested for purposes of his participation in KPERS and eligible to receive benefits thereunder.

(2) Respondent's offer to resign from the Office of Bourbon County Attorney effective January 1, 2002, is accepted by the Court, and he is directed to properly tender his resignation effective on such date.

(3) Respondent's offer to retire from the practice of law when he becomes eligible for KPERS benefits (January 1, 2002), is accepted and on the next renewal date (July 1, 2002), he is to elect inactive status with respect to his license to practice law.

(4) Respondent shall not violate any of the Kansas Rules of Professional Conduct during his remaining service as Bourbon County Attorney.

IT IS FURTHER ORDERED that in the event respondent fails to abide by the conditions set out herein, a show cause order shall be issued to respondent, and this court shall take whatever disciplinary actions it deems just and proper, including disbarment, without further formal proceedings.

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports and that costs of the proceeding be assessed to respondent.